[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 19, 2003
THOMAS K. KAHN
CLERK

No. 02-15525

_____

D. C. Docket No. 01-01260 CV-8-T-30MSS

WILLIAM M. SHAW,

Plaintiff-Appellee,

versus

CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
a Connecticut Corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(December 19, 2003)**

Before BARKETT, MARCUS, and ALARCÓN[*], Circuit Judges.

MARCUS, Circuit Judge:

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

This is an appeal from a district court order granting final summary judgment in favor of the plaintiff, William M. Shaw, in this ERISA action against the defendant, Connecticut General Life Insurance Company ("Connecticut General"), seeking long-term disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. After thorough review of the record and careful consideration of the parties' briefs, we conclude that while the district court correctly employed a de novo standard to review the plan administrator's denial of benefits, it erred by granting final summary judgment to Shaw. Because there are genuine issues of material fact concerning whether Shaw was totally disabled at the time he stopped working for his employer, United Technologies Corporation ("UTC"), we reverse the district court's order of summary judgment and remand for further proceedings consistent with this opinion.

I.

The relevant facts and procedural history are straightforward. Shaw, now retired, was employed as a purchasing manager in UTC's automotive division from 1977 until April 19, 1999. In March 1999, Shaw filed a claim for short-term disability benefits and, in April 2000, sought long-term disability benefits and

waiver of life insurance premium benefits[1] under UTC's two disability insurance plans. Connecticut General was the claims administrator for both plans, although it insured only the long-term plan. (The short-term plan was self-insured.)

The UTC Choice Disability Benefits Summary Plan Description defines "short-term disability" as the "inability to perform the essential duties of your regular job because of illness, injury or pregnancy," and "long-term disability" as the "inability, due to illness or injury, to work at any job for which you are qualified by training, education or experience." The Group Long-Term Disability Contract defines "total disability" or "totally disabled" in these terms: "An Employee will be considered Totally Disabled if the Employee is totally and continuously disabled so that the Employee is completely prevented from engaging in <u>any</u> gainful occupation or employment for which the Employee is, or becomes, reasonably qualified by training, education, or experience" (emphasis in original).

Shaw was granted short-term benefits in April 2000, but was denied long-term benefits and waiver of life insurance premium benefits by Connecticut General, both initially in June 2000, and on reconsideration in December 2000 and January 2001. The information gathered during the investigation of Shaw's short-

---

[1] Shaw's life insurance plan included a Waiver of Premium provision for disability.

3

term benefits claim was used by the plan administrator in denying Shaw's long-term benefits claim.

Shaw's short-term disability benefits application claimed that as of April 19, 1999, he suffered from a disability which he described as "stress caused by company investigation which brought on diabetes." Shaw's application was accompanied by a report from his psychologist, Trisha B. Wilmoth, Ph.D., which said in pertinent part: "Mr. Shaw has suffered with diabetes as a chronic condition which becomes unstable under stress. He was seen for a total of 44 sessions [from October 1994 through March 1999 and was] diagnosed as depressed. . . . Mr. Shaw's condition is not helped by his employment which not only does not reward competency, but also lacks decisive leadership in a hostile environment." Dr. Wilmoth also included a letter opining that Shaw's "estimated return to work date is unknown at present due to the hostile workplace environment that exacerbated his condition" (emphasis added).

On November 11, 1999, Connecticut General contacted Dr. Wilmoth's office to request copies of Dr. Wilmoth's office notes and additional information addressing why Shaw could not return to work, or whether he could return to his job if he reported to another supervisor or manager. Soon thereafter, Dr. Wilmoth sent copies of her office notes and a covering letter, which explained his condition

4

in these terms: "Mr. Shaw is still on medication for depression and takes insulin orally and by injection which he monitors twice daily. He is stable only under non-stressful conditions. If you were to put him back in similar conditions, he would most likely have a similar reaction that began the stress-depression-diabetes cycle. This is the reason why his return to work date remains unknown." Dr. Wilmoth declined to elaborate when Connecticut General sought clarification of Shaw's treatment plan.

Thereafter, Connecticut General referred the matter to its staff nurse, Diana K. Morgan, R.N. ("Nurse Morgan"), for review. After examining Shaw's medical information, Nurse Morgan reported on December 8, 1999 that Shaw had been treated by Dr. Wilmoth since 1994, but that "[t]here [wa]s no indication what changed in [Shaw's] condition that he could no longer do his job, except that the company was sold and he appears to have decided to retire." She also wrote that the "[m]edical information on file does not support [Dr. Wilmoth's] opinion of [Shaw's] disabling condition," and that the records show "that [Shaw] has been traveling quite a bit since he stopped working" and "engaging in social situations that do not reflect someone as depressed."

Connecticut General then asked Dr. John M. Billinsky, Jr., a psychiatrist and physician advisor, to conduct a peer review of Shaw's medical records and a

peer-to-peer interview with Dr. Wilmoth. After the interview, Dr. Billinsky reported on February 8, 2000 that Dr. Wilmoth was "vague and impressionistic" in her responses to specific questions, and that she "was unclear of the original circumstances of his work stress. On the one hand she perceives his mental and physical condition as being so brittle that he cannot work, yet does not indicate any reservation about his traveling from Florida to Massachusetts to care for his ill mother." He also reported that Dr. Wilmoth was uncertain whether Shaw was also seeing a psychiatrist. Dr. Billinsky pointed out that Dr. Wilmoth's diagnosis of depression corresponded to a diagnosis of Dysthymic Disorder, "a chronic depressive disorder of mild to moderate severity that in and of itself does not generally result in significant functional impairment." He further opined that "[a]n assertion by Dr. Wilmoth that [Shaw] is disabled on account of either [diabetes or hypertension] would be beyond the scope of her professional license."

Connecticut General then obtained the 1999 office notes of Dr. Durai, Shaw's treating physician. Shaw's attorney also sent to Connecticut General a letter from Dr. Durai, dated March 8, 2000, which stated in pertinent part:

> Mr. Shaw has been my patient for the past ten years. His medical problems include stress, hypertension and diabetes. Mr. Shaw underwent major back surgery approximately [two and a half] years ago which kept him homebound for an extended period of time. His medical problems are aggravated by job stress.

6

It is my medical opinion [that] returning Mr. Shaw to the work environment would be detrimental to his well being and not medically prudent.

On April 5, 2000, Connecticut General approved payment of full benefits covering twenty-six weeks, the maximum benefits period under the short-term plan. (The benefits covered the period beginning September 14, 1999 -- the date following the end of Shaw's salary continuance -- and ending twenty-six weeks later on March 13, 2000.)

Shaw then filed his claim for long-term disability benefits and waiver of life insurance premium benefits, and Connecticut General referred Shaw's claim to Nurse Morgan for a second review. She examined the medical records from Dr. Durai and wrote that they "document poor control of [Shaw's] diabetes and low blood count," but that her original recommendation still stood that "[t]he medical information on file does not support . . . [Shaw's] disabling condition."

Connecticut General then referred the entire file, including Shaw's medical records and Dr. Billinsky's report, for still another medical review, to a second physician advisor, Dr. Michael Fitzpatrick. On June 12, 2000, Dr. Fitzpatrick informed Connecticut General that "[d]iabetes and hypertension are chronic conditions and [Shaw] is likely to have had these disorders [f]or some time although he apparently was able to work for many years [w]ithout a suggestion

that 'work stress' was adversely affecting his physical status." He further opined that "[t]here is certainly no indication that [Shaw] would be unable to work in another environment if he found his current work situation to be stressful." Dr. Fitzpatrick also observed that Shaw's diabetes and hypertension had not previously prevented him from working, nor were there any DSM-IV criteria listed in Dr. Wilmoth's reports to support any finding that a psychiatric impairment would bar him from working. Simply put, Dr. Fitzpatrick's findings mirrored the conclusions of Dr. Billinsky and Nurse Morgan that Shaw was not totally disabled.

On June 15, 2000, Connecticut General formally denied Shaw's claim for long-term disability benefits and waiver of life insurance premium benefits, concluding that "the medical information provided does not support a psychiatric or physical condition(s) to be severe enough to support total disability from any occupation as defined under the Long Term Disability and Waiver of Premium contracts." Connecticut General invited Shaw to submit additional information for its review.

Thereafter, Shaw's attorney sought reconsideration, and on December 1, 2000, sent Connecticut General additional information including: a letter from the attorney observing that Shaw had been found totally disabled by the Social

Security Administration;[2] Dr. Durai's complete medical file; the medical records of Dr. Nucci, who performed Shaw's back surgery in February 1998;[3] and a psychiatric evaluation,

dated November 7, 2000, from Dr. Howard A. Goldman, who conducted an evaluation of Shaw at Shaw's request in order to support his claim.[4]

Connecticut General twice reaffirmed its denial by letters dated December 5, 2000, and January 15, 2001, concluding that the medical information submitted by Shaw did not support a finding that he was totally disabled or unable to otherwise perform <u>any</u> occupation for which he was qualified. The December letter specifically observed that the new medical information submitted by Shaw's

---

[2] Besides a letter from the Social Security Administration confirming that Shaw had been approved for Social Security benefits, no documentation (particularly documentation indicating the basis upon which the approval was granted) from the Social Security Administration has been entered into the record. Connecticut General states that it attempted to obtain Shaw's social security file by subpoena, but that the Social Security Administration advised that the file "could not be recovered." Appellant's Br. at 16.

[3] These records were accompanied by a letter from Dr. Nucci, dated November 30, 2000, which stated: "[Shaw] has been disabled since the latter part of 1997. . . . As of April of 1999, I do feel it was reasonable and medically necessary for him to stop working in his usual occupation. I do not believe he was able to perform the work he was qualified for in regard to training, education, or experience from April 19, 1999 through the present."

[4] The evaluation stated in part that Dr. Goldman "believe[s Shaw] is unable to work and would place him at permanent and total disability from a psychiatric viewpoint. Regarding his usual occupation, it is unlikely he will be able to work in anything at all related to his prior work as a Materials Manager and his prognosis is guarded for any type of work at all in the future because of both his psychiatric and medical problems." He also stated that, in his opinion, Shaw "was disabled from his job as of April of 1999," and that his treatment would "require lifetime antidepressants and possibly antianxiety medication."

attorney was not "sufficient to change [the] previous decision" in part because "[m]ost of th[e] information . . . submitted was prior to the date Mr. Shaw ceased working and it does not provide sufficient information to support his inability to work at the time he ceased working." It also said that "[a]lthough Dr. Goldman and Dr. Nucci expressed an opinion that Mr. Shaw was unable to work as of April 19, 1999, they provided no medical records showing they even treated Mr. Shaw at that time."

On May 7, 2001, Shaw sued Connecticut General in the Circuit Court of the Twelfth Judicial Circuit in Sarasota County, Florida, claiming that he was improperly denied long-term disability benefits and waiver of life insurance premium benefits in violation of Florida Statute § 627.613, which governs the timely payment of insurance claims. Connecticut General removed the case to the United States District Court for the Middle District of Florida, asserting that Shaw's state law claims were completely preempted by ERISA. Shaw then amended his complaint to assert ERISA claims for plan benefits, breach of fiduciary duties[5] and attorney's fees.

The district court denied Connecticut General's motion to dismiss, and later both parties cross-moved for summary judgment. The district court granted

_____

[5] Shaw voluntarily dismissed this claim on November 9, 2001.

Shaw's motion and denied Connecticut General's. First, the district court found that the underlying insurance policy was the only ERISA plan document and since that document did not grant discretion to the claims administrator, it applied a <u>de novo</u> standard of review to Connecticut General's decision to deny Shaw long-term disability benefits. The district court applied the <u>de novo</u> standard to both plan interpretations and factual rulings of the plan administration as well, citing <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). The district court then examined whether the claims administrator's decision was "wrong and unreasonable" and determined that it was, explaining its ruling in these terms:

> Shaw . . . had presented written opinions of total disability from three doctors and one psychologist, plus a finding of disability by Social Security. [Connecticut General] had no direct medical evidence to refute these opinions. Hence, the Court finds its denial of benefits was wrong.
>
> Furthermore, it was unreasonable for [Connecticut General] to reject out of hand Shaw's submitted medical opinions from doctors who had examined him and accept as true the concerns raised by those who had only reviewed the medical records.

The district court added that "when a decision is both wrong and unreasonable, it [also] does not withstand . . . the heightened arbitrary and capricious standard of review," and that, "had the Court applied the arbitrary and capricious standard[,] it would have come to the same conclusion." Ultimately, the district court granted

11

summary judgment in favor of Shaw and awarded him long-term disability benefits. This appeal followed.

## II.

Connecticut General argues on appeal that the district court erred by: (1) finding that the Summary Plan Description was not a plan document to which the court could look for a grant of discretion; (2) failing to give deference to findings of fact by the plan administrator; (3) failing to uphold the decision to deny Shaw long-term disability benefits; and (4) violating Connecticut General's due process rights by granting summary judgment in favor of Shaw under the de novo standard of review, without allowing Connecticut General to present evidence not found in the administrative record or to cross-examine Shaw's witnesses.

We review a summary judgment ruling de novo, "view[ing] the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." Burton v. City of Belle Glade, 178 F.3d 1175, 1186-87 (11th Cir. 1999). A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"ERISA does not provide the standard to review decisions of a plan administrator or fiduciary." Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702, 705 (11th Cir. 1995) (citing Firestone, 489 U.S. at 109, 109 S. Ct. at 953). Instead, the United States Supreme Court established in Firestone three distinct standards for reviewing administrators' plan interpretations:  "(1) de novo where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001) (quoting Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir. 1997)).  In order to determine the appropriate standard of review, a court is required to examine "all of the plan documents." Cagle v. Bruner, 112 F.3d 1510, 1517 (11th Cir. 1997) (emphasis added).  "If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review." HCA Health Servs., 240 F.3d at 993.

In this case, Connecticut General suggests that there are two documents relating to the plan in the record: (1) the Connecticut General Group Long-Term Disability Contract (the "underlying policy"); and (2) the Summary Plan

13

Description (the "SPD"). The parties do not dispute that the underlying policy contains no express grant of discretion to the administrator and that absent any express grant, under controlling precedent, we apply a de novo standard of review to a claims administrator's benefits decision. See, e.g., Guy v. Southeastern Iron Workers' Welfare Fund, 877 F.2d 37, 38-39 (11th Cir. 1989) ("[ERISA] actions must be reviewed de novo unless the plan expressly gives the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." (emphasis added)).

Connecticut General points out that the SPD in this case clearly gives the claims administrator broad discretion over plan interpretation. Indeed, the SPD expressly provides that "Connecticut General has the right to determine eligibility for benefits and to interpret the terms and provisions of the plan[, and its] decision is conclusive and binding," which is language that would ordinarily justify the deferential standard. See Buce v. Allianz Life Ins. Co., 247 F.3d 1133, 1138-39 (11th Cir. 2001) (affirming the district court's application of heightened arbitrary and capricious review where the insurance policy's "Summary Plan Description provided that '[t]he insurance company has the exclusive right to interpret the provisions of the Plan, so its decision is conclusive and binding'" (citation

14

omitted)). However, under the very terms of the underlying policy, the modification contained within the SPD is invalid.

To begin with, the underlying policy explicitly states: "No change in this contract will be valid unless approved by the Insurance Company and evidenced by endorsement on this contract or by amendments to this contract signed by the Employer and by the Insurance Company, acting through its President, Vice President, Secretary or Assistant Secretary." This amendment procedure satisfies the requirements of the ERISA statute and its regulations. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 115 S. Ct. 1223, 1228, 131 L. Ed. 2d 94. See also 29 U.S.C. §§ 1102(b)(3), 1022(a), and §1024(b); 29 C.F.R. § 2520.104b-3. Having created a particular procedure, it seems evident to us that the parties to the agreement must follow that procedure in order to create enforceable amendments to their contract. Indeed, the Supreme Court has held, "ERISA . . . follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." Curtiss-Wright, 514 U.S. at 85, 115 S. Ct. at 1231.

Plainly, the grant of discretionary authority to a plan administrator is a material term. Indeed, it is a pivotal term between UTC and Connecticut General.

15

The parties did not include such a grant within the underlying contract.  Moreover, they both agreed to an integration clause stating: "This contract and the application of the Employer . . . will constitute the entire contract between the parties" and designed a specific procedure for modification of the contract.  If the employer and the insurance company wish to include a term as critical as a grant of discretionary authority to the plan administrator, then they can be expected either to write that term into the underlying contract or amend the contract according to their own, expressly agreed-upon procedures.

We note that the Ninth Circuit has applied the same reasoning when faced with similar circumstances.  In Grosz-Salomon v. Paul Revere Life Insurance Co., the Ninth Circuit reviewed an ERISA plan administrator's denial of long-term disability benefits.  237 F.3d 1154 (9th Cir. 2001).  As in this case, the language of the plan's SPD "indisputably" conferred discretion on the insurance company to "construe and interpret the policy under the plan," while the underlying policy lacked any grant of discretionary authority.  Id. at 1158-59.  The underlying policy also provided that "this policy and any application made by the policyholder or by an employee make up the entire contract between the parties."  Id. at 1161.  Although the Ninth Circuit acknowledged that "some contracts that purport to be fully integrated may not in fact be so[,]" it found that even if that were the case,

16

the grant of discretionary authority contained within the SPD was invalid because it was not "amended in conformance with policy provisions." Id.

In Grosz-Salomon, the underlying policy provided that the insurance company could change the underlying policy upon written request from the policyholder. 237 F.3d at 1161. Any such changes were required to be stated in riders or amendments to the policy, and those documents had to be signed by both the insurance company's President or Secretary and the policyholder. Id. Because no representative of the employer-policyholder ever signed off on the modification, the Ninth Circuit did not recognize the grant of discretionary authority contained within the SPD. Id. at 1162. As a result, the standard of review was de novo. Id.

We reach the same conclusion in this case. On this record, there is no evidence showing that the underlying policy was properly amended according to its own provisions, i.e. that both parties signed off to the amendment. The most we can find is an affidavit from counsel at UTC, simply saying that UTC "has specifically delegated to CGLIC the claims' administration under the Plan, and the discretion to determine eligibility and to interpret the Plan." The affidavit then cites the SPD provision granting Connecticut General discretionary authority, but, notably, does not even assert, let alone establish, that the parties properly amended

17

their own policy according to its amendment procedure. Indeed, Connecticut General has never argued, in its summary judgment motion or in its appellate briefs, that the underlying policy was ever properly amended. Rather, the gist of its argument has been that "there are many essential Plan details that could be altered by UTC <u>without</u> requiring Plan amendment." Appellant's Brief at 10 (emphasis added).

In short, since the clause within the underlying policy states that it is fully integrated, and in the absence of any evidence showing that the plan was properly amended, we are not prepared to validate the grant of discretionary authority contained only within the SPD. Quite simply, the district court was correct in applying a <u>de novo</u> standard of review to the plan administrator's denial of long-term disability benefits.[6]

_____

[6] Connecticut General also argues that the district court denied it due process by conducting <u>de novo</u> review without permitting it to enter evidence in addition to the administrative record. As a rule, <u>de novo</u> review permits the parties to put before the district court evidence beyond that which was presented to the administrator at the time the denial decision was made. See <u>Moon v. Am. Home Assur. Co.</u>, 888 F.2d 86, 89 (11th Cir. 1989) "American Home's contention that a court conducting a <u>de novo</u> review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a <u>de novo</u> review."). However, Connecticut General waived its claim to the extent it wishes to reopen discovery because it never appealed from the magistrate judge's denial of its own Motion to Limit the Scope of Review and Discovery. See <u>Onishea v. Hopper</u>, 171 F.3d 1289, 1305 (11th Cir. 1999) (declining to consider new argument raised for first time on appeal, especially where it was inconsistent with argument presented to trial court below).

Connecticut General also suggests that we should adopt the holding of the Fifth Circuit in Pierre v. Conn. Gen. Life Ins. Co., that absent any evidence of bad faith, we should always review a claims administrator's factual determinations under the abuse of discretion standard.[7]  932 F.2d 1552, 1562 (5th Cir.), cert. denied, 502 U.S. 973, 112 S. Ct. 453, 116 L. Ed. 2d 470 (1991); see also Pierre, 502 U.S. at 974  (White, J., dissenting from denial of cert.) (recognizing that "a disagreement has developed in the Courts of Appeals concerning the standard of review to be applied when a benefits decision turns on the facts of the case, rather than the interpretation of the terms in the ERISA plan").  Connecticut General then suggests that the claims administrator's decision in this case involved only a factual determination of whether Shaw met the plan's definition of "total

---

[7] Connecticut General describes Pierre as holding that a claims administrator's factual determinations must always be reviewed under the unmodified "arbitrary and capricious" standard of review.  See, e.g., Appellant's Brief at 22 ("It is well established in the Fifth Circuit Court of Appeals that the arbitrary and capricious standard of review applies to all ERISA benefits decisions which are based on questions of fact, not policy construction, even if there is no express grant of discretion in the plan documents." (citing Pierre, 932 F.2d at 1556)).  However, Pierre clearly rejects an "arbitrary and capricious" standard of review and instead adopts an "abuse of discretion" standard of review for claims administrators' factual interpretations.  See Pierre, 932 F.2d at 1562 ("Our thorough consideration leads us to the conclusion that the arbitrary and capricious standard for factual determinations is inapplicable because it may be interpreted and applied in a manner that is 'too stringent.' . . . [W]e hold that for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard [because it] best balances the need to respect the plan administrator's factual determinations and the need to protect beneficiaries by providing some judicial review of those decisions." (internal citation omitted)).  A panel of this Court has held, on the contrary, that "we recognize that, for purposes of evaluating a plan determination, there is no substantive distinction between the terms 'arbitrary and capricious' and 'abuse of discretion.'" Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1450 n.2 (11th Cir. 1997).

19

disability." The district court rejected this argument, determining that the Firestone standard of review applies to both factual findings and plan interpretations.

We agree for two reasons. First, this determination is not a purely factual one. Rather, as we see it, the question of whether Shaw is "totally disabled" is a mixed one, involving issues of both plan interpretation and fact. See, e.g., Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 382 n.12, 122 S. Ct. 2151, 2168, 2618 n.12, 153 L. Ed. 2d 375 (2002) (assuming that some degree of contract interpretation is required in deciding what the term "medical necessity" requires). Thus, for example, the decision whether to grant or deny benefits involves an interpretation of what constitutes "any gainful occupation or employment" for which the employee is qualified to engage in, since "total disability" requires that the employee be incapable of engaging in any such occupation. Moreover, the decision involves an interpretation of what constitutes "all reasonable measures to alleviate the injury or illness," which Shaw is required to take in order to receive long-term disability benefits.

Second, our Court has already declined to draw a distinction between law and fact in choosing the standard of review for denial of ERISA benefits. See e.g. Torres v. Pittston Co., 346 F.3d 1324 (11th Cir. 2003) (rejecting distinction

between legal and factual determinations which would entitle ERISA fiduciary to deferential arbitrary and capricious standard of review even though fiduciary is under conflict of interest); Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1451 (11th Cir. 1997) ("[W]e consistently have upheld application of the abuse of discretion standard of review to determinations involving both plan interpretations and factual findings under ERISA.") (emphasis added). Indeed, the Fifth Circuit's holding in Pierre, as Connecticut General concedes, is very much the minority view, and numerous circuits have declined to adopt it. Compare Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 250-51 (2d Cir. 1999) (holding de novo review applies to plan administrator's fact-based determination in absence of plan language granting discretionary authority); Rowan v. Unum Life Ins. Co. of Am., 119 F.3d 433, 435-36 (6th Cir. 1997) (same); Ramsey v. Hercules Inc., 77 F.3d 199, 204-05 (7th Cir.1996) (same); Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1183 (3d Cir. 1991); Reinking v. Philadelphia Am. Life Ins. Co., 910 F.2d 1210, 1213-14 (4th Cir.1990) (same), overruled on other grounds by Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017 (4th Cir.1993), with Pierre, 932 F.2d at 1562 (holding that administrator's factual determinations receive deferential review despite absence of plan language conferring discretionary authority).

21

In short, the district court correctly reviewed <u>de novo</u> the decision of the plan administrator to deny long-term disability benefits to Shaw.

III.

Although the district court properly applied <u>de novo</u> review to the plan administrator's decision, we think it erred in granting Shaw final summary judgment because, on this record, there are genuine issues of material fact concerning whether Shaw was totally disabled at the time he stopped working for United Technologies Corporation. After thorough review of the record, we conclude that the case cannot be resolved on summary judgment; accordingly, the case must be remanded for a bench trial. <u>See</u> <u>Howard v. Parisian, Inc.</u>, 807 F.2d 1560, 1567 (11th Cir. 1987) (holding that there is no right to trial by jury in an action to recover ERISA benefits); <u>see</u> <u>also</u> <u>Sullivan v. LTV Aerospace and Defense Co.</u>, 82 F.3d 1251, 1258 (2d Cir. 1996) (noting that the framework for review of the plan administrator's decision is "incompatible with a jury trial scheme" (citation omitted)). The trial judge may then determine whether the plan administrator's decision was "wrong and unreasonable" with the benefit of a fuller record.

The factual conflict is clear enough. Shaw presented evidence including statements from Dr. Nucci, Dr. Durai, Dr. Goldman, and Dr. Wilmoth. Most

notably, Dr. Goldman wrote, "I believe [Shaw] is unable to work and would place him at permanent and total disability from a psychiatric viewpoint. Regarding his usual occupation, it is unlikely he will be able to work in anything at all related to his prior work as a Materials Manager and his prognosis is guarded for any type of work at all in the future because of both his psychiatric and medical problems." Dr. Goldman further noted that "in [his] opinion, patient was disabled from his job as of April of 1999."

Connecticut General responded with evidence including opinions from Dr. Billinsky, Dr. Fitzpatrick, and Nurse Morgan. These individuals reviewed the opinions of Shaw's treating physicians and unanimously concluded that Shaw was not totally disabled. Dr. Billinsky reported that Dr. Wilmoth was "vague and impressionistic" in her responses to specific questions, and that she "was unclear of the original circumstances of his work stress. On the one hand she perceives his mental and physical condition as being so brittle that he cannot work, yet does not indicate any reservation about his traveling from Florida to Massachusetts to care for his ill mother." He pointed out that Dr. Wilmoth's diagnosis of depression corresponded to a diagnosis of Dysthymic Disorder, "a chronic depressive disorder of mild to moderate severity that in and of itself does not generally result in significant functional impairment."

23

Dr. Fitzpatrick informed Connecticut General that "[d]iabetes and hypertension are chronic conditions and [Shaw] is likely to have had these disorders [f]or some time although he apparently was able to work for many years [w]ithout a suggestion that 'work stress' was adversely affecting his physical status." He opined that "[t]here is certainly no indication that [Shaw] would be unable to work in another environment if he found his current work situation to be stressful." Nurse Morgan similarly concluded that "[t]he medical information on file does not support [Dr. Wilmoth's] opinion of [Shaw's] disabling condition," and "that [Shaw] has been traveling quite a bit since he stopped working" and "engaging in social situations that do not reflect someone as depressed."

Given the sharply conflicting evidence in this case, we are convinced that there is a genuine issue of material fact as to whether Shaw was totally disabled. This is especially true in light of the Supreme Court's recent decision in <u>Black & Decker Disability Plan v. Nord</u> explaining that "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians[, n]or does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." __ U.S. __ , __, 123 S. Ct. 1965, 1970, 155 L. Ed. 2d 1034 (2003). While "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the

24

opinions of a treating physician . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. at __, 123 S. Ct. at 1972. The district court, however, evidently gave special weight to the opinions of Shaw's treating physicians ("[I]t was unreasonable for [Connecticut General] to reject out of hand Shaw's submitted medical opinions from doctors who had examined him and accept as true the concerns raised by those who had only reviewed the medical records."). This was error under Supreme Court precedent.

Accordingly, we hold that the district court erred in granting summary judgment in favor of Shaw and REVERSE and REMAND for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**