Delores Ann LAKE, Plaintiff,

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

No. 8:03–CV–237–T–26EAJ.

United States District Court, M.D. Florida, Tampa Division.

Jan. 13, 2004.

John V. Tucker, Anderson & Tucker, St. Petersburg, FL, for Plaintiff.

Ralph C. Losey, Akerman Senterfitt, Orlando, FL, for Defendant.

### ORDER

LAZZARA, District Judge.

Before the Court are Defendant's Motion for Summary Judgment and Statement of Undisputed Facts (Dkts. 33 & 34), Plaintiff's Memorandum of Law in Opposition (Dkt.45), Plaintiff's Dispositive Motion for Summary Judgment and Statement of Undisputed Facts (Dkts. 35 & 36), and Defendant's Memorandum in Opposition. (Dkt.44). After careful consideration of the arguments, the applicable law, and the file, the Court concludes that Defendant's motion for summary judgment should be granted, and Plaintiff's motion for summary judgment should be denied.

### FACTUAL BACKGROUND

This is an action brought by Plaintiff Delores Ann Lake (Lake) under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. (ERISA). Beginning in 1992, Lake worked as a general manager of a Steak n Shake restaurant, which was a "participant employer" under an insurance policy issued by Defendant Hartford Life and Accident Insurance Company (Hartford) to Consolidate Products, Inc. (Dkt.16, Exh. A). On December 19, 1998, Lake slipped and fell on a wet floor at work and fractured her left arm, particularly the elbow.[1] (Dkt. 16, Exh. C at 0009, 0031). At the time of the incident, Lake was approximately 50 years old. (Dkt. 16, Exh. C at 0527). Lake was hospitalized after the accident for four days and Dr. Gomez performed surgery to place pins in her arm. (Dkt. 16, Exh. C at 0009, 0530 & 0063). She was unable per her physician's orders to return to work until some time in March 1999. (Dkt. 16, Exh. C at 0530 & 0080). Apparently, she worked five days in March 1999 with a lifting restriction of 10 pounds, but developed an abscess and her orthopedic surgeon, Dr. Gomez, required her to discontinue work. (Dkt. 16, Exh. C at 0525, 0529, 0032 & 0080).

Lake presented herself to an emergency room on April 6, 1999. (Dkt. 16, Exh. C at 0080). Her elbow was x-rayed, which showed the pin, and a fracture line was again evident. (Dkt. 16, Exh. C at 0519 & 0037). Lake was again advised by Dr. Gomez to stop working. (Dkt. 16, Exh. C at 0080).

In June 1999, x-rays revealed a nonunion of the left elbow. (Dkt. 16, Exh. C at 0525). On June 27, 1999, Lake sought to convert the short term disability she had been collecting to long term disability (LTD) benefits. (Dkt. 16, Exh. C at 0023). In September 1999, Hartford wrote to Lake requesting that she have an Attending Physician Statement completed by her physician. (Dkt. 16, Exh. C at 0087). Hartford wrote again to Lake in Novem-

---

1. The x-ray showed comminuted fracture of the olecranon. (Dkt. 16, Exh. C at 0519).

ber 1999, stating it had not yet received any information from her physician. (Dkt. 16, Exh. C at 0088). Finally, in January 2000, Hartford requested for the last time the completed Attending Physician Statement and Physical Capacities Evaluation form. (Dkt. 16, Exh. C at 0090). Hartford informed Lake that her benefits would cease in January 31, 2000, if the requested document had not been received. (Dkt. 16, Exh. C at 0090).

On February 1, 2000, Dr. Gomez wrote to Hartford. (Dkt. 16, Exh. C at 0091). Lake was examined by Dr. Gomez on February 1st, and demonstrated "good range of motion of the elbow from 5 to approximately 120 degrees." (Dkt. 16, Exh. C at 0091). X-rays taken that day confirmed a fully-healed fracture. (Dkt. 16, Exh. C at 0525 & 0091). Dr. Gomez restricted her to sedentary work without lifting, pushing, or pulling over five pounds. (Dkt. 16, Exh. C at 0525, 0091 & 0095). At that time, Dr. Gomez opined that Lake "is going to have problems for an extended period of time and I will recommend that she be reevaluated for possible training in a different type of activity from what she has been doing in the past." (Dkt. 16, Exh. C at 0091).

It appears that she did not see Dr. Gomez again until August 22, 2000. (Dkt. 16, Exh. C at 0106). At that time, Dr. Gomez referred Lake for an independent evaluation of whether she had attained maximum medical improvement. (Dkt. 16, Exh. C at 0106). Dr. Gomez' primary diagnosis was old fracture of the olecranon, and the secondary diagnosis was post-traumatic arthritis of the left elbow. (Dkt. 16, Exh. C at 0106).

Meanwhile in April 2000, Lake began to experience pain in both feet. (Dkt. 16, Exh. C at 0525). Lake saw Dr. Berman, who referred her to Dr. Habib for a noninvasive vascular examination. (Dkt. 16, Exh. C at 0235–0247). In August 2000,

Dr. Habib recommended the insertion of a stent in the right common iliac artery with a possible balloon to the femoral arteries. (Dkt. 16, Exh. C at 0163). Dr. Habib urged Lake to either follow his advice or obtain a second opinion because her blockage may worsen and lead to more foot pain and possible limb loss. (Dkt. 16, Exh. C at 0163). Apparently, later testing including an MRA of the aorta and an angiogram did not reveal any aortoiliac disease. (Dkt. 16, Exh. C at 0235).

In September 2000, Dr. Choi, an orthopedic surgeon, diagnosed Lake with bilateral second, third, and fourth metatarsophalangeal joint synovitis with pain in the second web space. (Dkt. 16, Exh. C at 0228). Dr. Choi noted that Lake had been to several podiatrists, vascular surgeons, and cardiologists, and that Lake had not received relief from numerous cortisone injections for the pain in her feet. (Dkt. 16, Exh. C at 0222–0223). In September 2000, Dr. Choi performed a bilateral second, third, and fourth metatarsal phalangeal joint release. (Dkt. 16, Exh. C at 0523, 0227–0228). On October 24, 2000, Dr. Choi ordered Lake not to return to work for six weeks so that she could remain off her feet. (Dkt. 16, Exh. C at 0230).

Some time later, after various testing, Lake was diagnosed by a rheumatologist, Dr. Sebba, with rheumatoid arthritis. (Dkt. 16, Exh. C at 0525 & 0263). On October 30, 2000, Lake was involved in a pedestrian accident and developed pain in the right ear, face, neck and right hip. (Dkt. 16, Exh. C at 0522). In October 2000, she was diagnosed with temporal mandibular joint dysfunction by Dr. Rosoff. (Dkt. 16, Exh. C at 0522 & 0304–0305). In January 2001, Dr. Zubillaga, a neurologist, diagnosed a soft tissue injury. (Dkt. 16, Exh. C at 0522 & 0280–0281). Lake was apparently experiencing signifi-

cant pain at this time, predominantly in her feet. (Dkt. 16, Exh. C at 0522).

On January 4, 2001, Lake underwent a functional capacity evaluation (FCE), having been referred to Sports and Orthopedic Rehabilitation Services, Inc., by Dr. Gomez. (Dkt. 16, Exh. C at 0519 & 0109–0135). The FCE showed that she was able to function at a sedentary level for an eight-hour day, with a maximum torso lift capacity of 10 pounds. (Dkt. 16, Exh. C at 0519 & 0135). Lake displayed "symptom/disability exaggeration behavior" and demonstrated very poor effort or voluntary submaximal effort "which is not necessarily related to pain." (Dkt. 16, Exh. C at 0519 & 0134–0135). The person who administered the FCE wrote that "[b]ased on this profile, other data must be considered to help understand the true functional ability and to assist with medical and vocational planning." (Dkt. 16, Exh. C at 0519 & 0134–0135). The tester noted in the file that Lake "requested to stop evaluation prematurely due to extreme pain in left elbow and both feet, therefore shoulder, overhead, carry lifts, balance, crawling, climbing, arm and leg controls were not tested." (Dkt. 16, Exh. C at 0128).

Other notations in the FCE report include the following:

Ms. Lake passed 4/8 validity criteria during the Occasional Material Handling Tests, 50%, suggesting very poor effort and invalid results which should not be used for medical and vocational decisions. Other data must be considered to help understand Ms. Lake's actual functional ability today. In some cases, professional conjecture is necessary regarding the true functional ability or a repeat exam may be considered after the results have been explained to the patient.

(Dkt. 16, Exh. C at 0120). Lake failed 1/5 validity criteria "for extrapolating her Occasional Material Handling ability from Static Strength Testing," which suggested that she may have been able to lift more weight in the leg lift than she demonstrated. (Dkt. 16, Exh. C at 0119). With respect to the hand tests, Lake passed 8/19 validity criteria, 42%, leading the tester to make the same notations as for the Occasional Material Handling Tests. (Dkt. 16, Exh. C at 0117). The Non–Material Handling tests left Lake's actual functional ability "to some conjecture." (Dkt. 16, Exh. C at 0115). Finally, the tester noted that three particular profiles indicated that Lake was "attempting to control the test results to demonstrate a greater level of disability than what is actually present, the motivation of which is not known." (Dkt. 16, Exh. C at 0112).

Dr. Gomez re-evaluated Lake in March 2001, took x-rays of the left elbow, and made a diagnosis of early post-traumatic arthritis of the left elbow. (Dkt. 16, Exh. C at 0521 & 0217–0218). Dr. Gomez's notes reflect that Lake had reached maximum medical improvement as of March 31, 2001. By April 2001, Dr. Creighton's records show that Lake's feet were worse despite therapy. (Dkt. 16, Exh. C at 0521 & 0284–0297).

On April 18, 2001, Hartford denied Lake's claim for Long Term Disability (LTD) benefits. (Dkt. 16, Exh. C at 0194–0197). The letter of denial provided that Hartford had based its decision on policy language and all the documents in her file including eleven specific documents. (Dkt. 16, Exh. C at 0196).

In August 2001, Lake was evaluated by a pain management specialist, Dr. Leal, for bilateral foot pain. (Dkt. 16, Exh. C at 0521). Dr. Leal diagnosed Lake with bilateral foot pain possibly secondary to peripheral neuropathy of an unknown cause, and recommended lumbar sympathetic blocks. (Dkt. 16, Exh. C at 0521, 0233–0235).

Three times beginning in December 2001, Hartford requested Dr. Gomez to complete an updated physical capacities evaluation form. (Dkt. 16, Exh. C at 0317–0329). Dr. Gomez submitted the completed form on February 2, 2002. (Dkt. 16, Exh. C at 0331–0334). He noted that Lake had reached maximum medical improvement as of March 31, 2001, and referred Hartford to the FCE already conducted in January 2001 for the evaluation of Lake's physical capacities. (Dkt. 16, Exh. C at 0333).

On April 29, 2002, Hartford again denied Lake LTD benefits. (Dkt. 16, Exh. C at 0369–0374). Hartford acknowledged that Lake's counsel had taken issue with the FCE, because it did not address " 'short term or long term impact of non-exertional impairments,' which includes pain and residual effects of various medications." (Dkt. 16, Exh. C at 0373). Hartford noted that the information in Lake's file was referred to Mark Curtis, LTD Team Leader for a complete review. (Dkt. 16, Exh. C at 0373). He noted that Lake had reached maximum medical improvement as of March 31, 2001, and referred Hartford to the FCE already conducted in January 2001 for the evaluation of Lake's physical capacities. (Dkt. 16, Exh. C at 0333).

Dr. Gomez ordered a Functional Capacity Evaluation, which Ms. Lake attended on January 4, 2001. The results of the exam, taking into account her pain complaints, concluded that she was capable of performing:

"Sedentary Level Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles."

Based on this information, Ms. Lake's claim was denied benefits beyond March 31, 2001. Included with the information you submitted, were medical records from Dr. Creighton. Ms. Lake was seen January 15, 2001 and it was noted that she obtained Rockport shoes and had

noticed some improvement. She was seen for follow up on January 25, 2001 and she complained of increased TMJ pain. She further explained that the paraffin therapy and shoes helped her feet, but she was still experiencing pain. She was to undergo EMG studies.

We have on file a letter dated March 13, 2001 from Dr. Gomez to Nurse Case Manager, Diane Palus stating that Ms. Lake continued to have elbow pain. The patient was given permanent impairment rating. The letter also stated:

At the present time, Mrs. Lake is not working. Apparently she has had some conflict with the company where she was working and she mentions that they do not want to take her back because she is a high risk.

We do not have record that Ms. Lake was seen again by Dr. Creighton until April 5, 2001 and we verified that this was the last visit with the patient. His office note stated:

Ms. Lake returns today for recheck of injuries after a long absence. She relates that she had to go out of town to take care of her sister who had surgery and was gone for several months due to this problem.

Ms. Lake communicated to the doctor that her feet problems were worse. Her TMJ had improved significantly after treating with Dr. Rosoff.

Other than the Functional Capacity Evaluation, we do not have medical documentation from any of Ms. Lake's treating providers supporting restrictions and impairments that would prevent her from performing sedentary level activity on a full-time basis as of April 1, 2001. Furthermore, medical records do not document that Ms. Lake was

experiencing any side effects resulting from her medication. (Dkt. 16, Exh. C at 0371–0372).

Lake's counsel again submitted supplemental documents, including receipts from prescription drugs Lake had been taking and some additional physician's records. (Dkt. 16, Exh. C at 0408–0489). Hartford referred the claim for an independent medical review with Dr. Andrea Wagner, a physiatrist,[2] to conduct a medical record review of Lake in January 2002. (Dkt. 16, Exh. C at 0527–0514). Dr. Wagner opined that Lake's medical records failed to "document any specific medical condition or impairment which would require medical treatment other than [her] subjective pain complaints." (Dkt. 16, Exh. C at 0516). Dr. Wagner summarized the FCE as follows:

A functional capacity evaluation is the best means of assessing an individual's functional level. This is a far better means of assessing functionality as opposed to the subjective account of an individual. The functional capacity evaluation did report symptom and disability exaggeration behavior. This was thought not to be related to pain impairment or disability. The functional capacity evaluation also states that Ms. Lake demonstrated poor effort or voluntary submaximal effort. This statement indicates that Ms. Lake demonstrated poor effort. It is often the case that an individual is not motivated to perform at their maximal level of functionality in the setting of a functional capacity evaluation. Despite these limitations, this functional capacity evaluation remains the most accurate means to assess Ms. Lake's functionality.

.        .        .        .        .

The medical records reviewed do not document any complaints by Ms. Lake regarding side effects from her medications.

.        .        .        .        .

As of 3/31/01 and beyond, Ms. Lake is functional at a sedentary level with restrictions.... [T]here is no condition identified in the medical record that precludes sedentary functionality on a full-time basis.

(Dkt. 16, Exh. C at 0515–0516).

For the last time on January 23, 2003, Hartford denied LTD benefits. (Dkt. 16, Exh. C at 0511–0513). This action ensued.

### Material Terms of the Group Long Term Disability Insurance Policy

The LTD policy defines "total disability or totally disabled" as follows:

(1) during the Elimination Period ["the period of time you must be Disabled before benefits become payable"]; and (2) for the next 24 months, you are prevented by:

    (a) accidental bodily injury;

    (b) sickness;

    (c) mental illness;

    (d) substance abuse; or

    (e) pregnancy,

from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.

---

**2.** A physiatrist "is a physician who specializes in physical medicine and rehabilitation, and frequently treats patients with musculoskele-tal injuries and pain syndromes." (Dkt. 33 at pg. 8, n. 7)

(Dkt. 16, Exh. B at pgs. 11–12). The policy further defines "any occupation" as an occupation:

(1) for which you are qualified by education, training or experience; and

(2) that has an earnings potential greater than an amount equal to the product of your indexed Pre-disability Earnings and the Benefit Percentage.

(Dkt. 16, Exh. B at pg. 7). Thus, LTD benefits are available only if one is disabled as to "any occupation."

The LTD policy is provided as part of a welfare benefits plan with the plan administrator named as the employer. (Dkt. 16, Exh. B at pg. 29). The documents recite that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Dkt.16, Exh. B, pg.27).

## STANDARD OF REVIEW

■ Summary judgment is appropriate in cases in which there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c). The court must view the record in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). In ERISA cases, the statute "does not provide the standard to review decisions of a plan administrator or fiduciary." *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1281–82 (11th Cir.2003) (quoting *Marecek v. BellSouth Telecomms., Inc.*, 49 F.3d 702, 705 (11th Cir. 1995)). The courts follow the directive of the United States Supreme Court set forth in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There are three standards for reviewing administrators' plan interpretations:

(1) de novo where the plan does not grant the administrator discretion[;]

(2) arbitrary and capricious [where] the plan grants the administrator discretion[;] and

(3) heightened arbitrary and capricious where there is a conflict of interest.

*Shaw*, 353 F.3d at 1281–82 (citing *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir.2001)). If the documents grant the claims administrator discretion, "then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review." *Shaw*, 353 F.3d at 1281–82 (citing *HCA Health Servs.*, 240 F.3d at 993).[3]

■ "Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" *See HCA Health Servs.*, 240 F.3d at 993. An administrator's decision is deemed "wrong" when the court disagrees with the claims administrator's plan interpretation after a *de novo* review of the plan documents and disputed terms. *See id.* at n. 23. If the court disagrees with the decision and thus finds it "wrong," then the court next decides whether "the claimant has proposed a 'reasonable' interpretation of the plan." *See id.* at 994, quoting *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir.1994).

■ Even if the claimant's proposed interpretation is reasonable, the court must still determine whether the claims administrator's "wrong" interpretation is reasonable. At this point, the court must gauge the self interest of the claims administrator. *See HCA Health Servs.*, 240 F.3d at

---

**3.** No distinction is drawn between law and fact in choosing the standard of review for denial of ERISA benefits. *See Shaw*, 353 F.3d

at 1284–85 (citing *Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir.2003)).

994. If there is no conflict of interest, then the inquiry stops, and the review is arbitrary and capricious. *See id.* If a conflict does exist, then the heightened arbitrary and capricious review must be invoked. *See id.*

■ Under the heightened standard of review, "the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." *HCA Health Servs.*, 240 F.3d at 994. The claims administrator satisfies this burden by showing that its "wrong but reasonable" plan interpretation benefits the class of participants and beneficiaries. *See id.* at 995. Even if the claims administrator accomplishes this task, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious." *See id.* If it cannot be shown that the participants and beneficiaries of the plan are benefited, then the claims administrator's plan interpretation is not entitled to deference.

## DISCUSSION

■ The plan documents in this case unequivocally grant Hartford the discretion and authority to determine all benefit claims and appeals and to construe and interpret the terms and provisions of the policy. Because the plan administrator making the benefit decision is also the insurance company responsible for paying claims, as is Hartford in this case, the heightened arbitrary and capricious standard is applicable. *See Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1563–64 (11th Cir.1990). At the outset, this court must conduct a *de novo* review of the record and the policy to determine whether the interpretation was "wrong" as that term is defined by case law in this circuit. If this Court determines that the interpretation was not "wrong," then it is unnecessary to explore all the details of the particular conflict of

interest. *See HCA Health Servs.*, 240 F.3d at 993–94, citing *Marecek*, 49 F.3d at 705.

## Denial of Benefits

■ Based on a de novo review of the information before Hartford, this Court does not find Hartford's decision to deny LTD benefits "wrong." It is undisputed that Hartford relied on the FCE and all other medical records and reports to deny benefits.

### Elbow Injury

Dr. Gomez, Lake's own treating physician, referred her to Sports and Orthopedic Rehabilitation Services, Inc., for an FCE. In January 2001, Lake took the FCE, which showed that she was able to function at a sedentary level for an eight-hour day, with some lifting restrictions. There is no question that Lake stopped the FCE before several tests were completed.

Lake displayed "symptom/disability exaggeration behavior" during the FCE, meaning that her behavior may or may not have been related to pain. The three test profiles that measure the component of exaggeration, however, all indicated that Lake attempted "to demonstrate a greater level of disability than what is actually present, the motivation of which is not known." The FCE test administrator noted in the report that other data should be considered to assist with medical and vocational planning. In any event, the tester noted that professional conjecture may be used regarding Lake's true functional ability.

In March 2001, Dr. Gomez re-evaluated Lake and took x-rays of the left elbow, finding early post-traumatic arthritis of the left elbow. Dr. Gomez declared that Lake had reached maximum medical improvement as of March 31, 2001, and referred Hartford to the FCE already con-

ducted in January 2001 for the evaluation of Lake's physical capacities. The FCE results indicated that Lake could perform "Sedentary Level Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles."

Based on the information before Hartford, LTD benefits was denied as of March 31, 2001. Lake did not undergo another FCE, and none of Lake's other treating providers found additional restrictions and impairments that would prevent her from performing sedentary level activity on a full-time basis as of April 1, 2001. While Lake was still experiencing elbow pain, Dr. Gomez as her treating physician did not restrict her from returning to a sedentary job. Lake did not present medical records from any other provider indicating that the pain in her left elbow prevented her from sedentary employment. Accordingly, Lake's elbow problems did not prohibit her from working in "any" occupation.

### Foot Pain

In addition to her elbow problems, Lake has suffered pain in both feet since April 2000. Several providers attempted to ascertain the source of the pain in her feet. She underwent several treatments including surgery on one foot, injections for pain, paraffin therapy, and wearing better shoes. Some of the treatments were successful, and some were not. Despite the various treatments, Lake did not see Dr. Creighton, who was treating Lake for her feet problems, from January 2001, until April 5, 2001. Lake told Dr. Creighton that her feet problems were worse, and the doctor noted in her file the long absence between office visits. In reviewing the record before Hartford, there are no medical reports or records before Hartford that show Lake's feet problems prevented her from performing a sedentary occupation.

### Other Considerations

■ While recognizing Lake's position with respect to the notation in the FCE urging more data to be provided before determining her medical and vocational abilities, the Court agrees with Hartford that a functional capacity evaluation is the best means of assessing an individual's functional level. In a situation such as in this case in which there is one FCE conducted by a provider who was referred by the plaintiff's own treating physician, and the plaintiff has provided no medical records to refute the findings in the FCE, Hartford was not "wrong" in relying on the FCE. The FCE indicated that Lake demonstrated poor effort while taking the examination, and as noted by Dr. Wagner, "[i]t is often the case that an individual is not motivated to perform at their maximal level of functionality in the setting of a functional capacity evaluation. Despite these limitations, this functional capacity evaluation remains the most accurate means to assess Ms. Lake's functionality."

Finally, to the extent Lake claims she experienced side effects from her medications, none of her medical records reflect any such complaints from Lake. Hartford's physician, Dr. Wagner, reviewed Lake's medical records and correctly found that as of March 31, 2001, and beyond, there is no condition identified in her medical records that precludes the finding that Lake is functional at a sedentary level with restrictions on a full-time basis. Accordingly, the Court finds that under the heightened arbitrary and capricious standard, Hartford's denial of LTD benefits must not be disturbed.

It is therefore **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Dkt. 33) is **GRANTED**.

2. Plaintiff's Dispositive Motion for Summary Judgment (Dkt. 35) is **DENIED**.

3. The Clerk of this Court is directed to enter a final summary judgment in favor of Defendant and against Plaintiff on all claims.

4. The Clerk is directed to close this file.