**Deborah WISE, Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

**Civ.A. No. 1:04–CV–0784–RWS.**

United States District Court, N.D. Georgia, Atlanta Division.

March 9, 2005.

John Thomas Dufour, Van Pelt & Dufour, Carrollton, GA, for Plaintiff.

Michael Andrew. Coval, Nikole Marie Crow, Carter & Ansley, Atlanta, GA, for Defendant.

### ORDER

STORY, District Judge.

Plaintiff Deborah Wise originally brought this action in the Superior Court of Fulton County, Georgia seeking to recover benefits under an employer-sponsored disability insurance plan. Defendant Hartford Life and Accident Insurance Company ("Hartford") removed the case to federal court in March of 2004, relying on Plaintiff's assertion of a federal claim under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"). Hartford has now moved for summary judgment.

### Background

#### I. The Policy

Plaintiff is a former employee of Wal–Mart. At the time relevant to this action, Hartford was under a contract with Wal–Mart to provide group long-term disability income insurance to Wal–Mart's eligible employees. Under that policy, "Total Disability" is defined to include, with respect to purported disabilities enduring for over one year, the employee's inability to "perform[ ] the essential duties of any occupation for which [he or she is] qualified by education, training or experience." The policy further provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the ... Policy."

#### II. Plaintiff's Claim and the Cessation of Benefits

On or about June 16, 1999, Plaintiff informed Hartford that she had become disabled due to mitral valve prolapse, fibromyalgia, arthritis, and depression. In support of her claim, she obtained, and apparently produced, a form entitled "Short Term Disability Claim/Medical Statement," dated June 1, 1999, in which a Dr. Keith Fuller responded in the negative to the question, "In your opinion, is this patient physically and mentally capable of engaging in gainful employment?"[1] Dr. Fuller supported his prognosis by stating that Plaintiff suffered from fibromyalgia, paresthesais, and leg pain, and indicated that the conditions would persist for Plaintiff's lifetime.

Hartford initially approved Plaintiff's claim, and began disbursing disability benefits under the policy. In February 2000, however, it initiated an investigation into whether Plaintiff would qualify for benefits under the "any occupation" definition of disability that applied to alleged disabili-

---

1. It is unclear from the parties' papers whether Plaintiff actually tendered this form in connection with her initial claim for disability benefits. Given the date on the form, however, it appears to have been prepared at approximately the time Plaintiff submitted her original claim to Hartford. In any event, both parties appear to agree that Dr. Fuller's opinion is within the body of evidence the Court is permitted to consider in resolving the instant motion for summary judgment.

ties lasting over one year. It requested information from Plaintiff's treating physician, and additionally ordered what is known in the industry as a "functional capacity evaluation."

In response to Hartford's request, Plaintiff's doctor, Arvind P. Kamath, M.D., responded by stating that he had treated Plaintiff in late-March 2000, at which point she was suffering from acute sinusitis, headache, reflux esophagitis, biliary colic, and fibromyalgia.[2] While he went on to state that in an eight-hour workday she could sit for two to three hours, stand for one to two hours, and walk for one to two hours, in response to the question, "What is the prognosis for return to work in any capacity[,]" Dr. Kamath replied, "Not good, till symptoms of fibromyalgia improve."

Thereafter, at the behest of Hartford, a third-party service provider performed a functional capacity evaluation on Plaintiff. At the conclusion of testing, it opined that Plaintiff "would be capable of functioning in a light work category according to the [United States Department of Labor's] standards." It reasoned that "[s]he demonstrated good aerobic capacity and her physiological response to activities was appropriate[,]" and found that "[i]n an 8 hour day, she demonstrated the ability to sit up to 5 hours/day, stand up to 4 hours/day and walk up to 2 hours/day in any light work category job." Following its review of the forgoing information, as well as the medical file produced by Dr. Kamath, Hartford discontinued Plaintiff's disability benefits.

The record additionally shows that, at about this time, Hartford became aware of a decision of the Social Security Administration, Office of Hearings and Appeals, in which it found Plaintiff "disabled" within the meaning of the Social Security Act.[3] While the record reveals that Hartford sent correspondence to Plaintiff indicating that her monthly disability payments would be reduced by the amount of her Social Security benefits, there is nothing in the original benefits cessation letter indicating that Hartford considered the decision of the administrative law judge in

---

**2.** In his original report, Dr. Kamath stated that Plaintiff was suffering from "fibromyalgia in remission." In subsequent correspondence, he elucidated his diagnosis by explaining that:

> [A]lthough I wrote that her fibromyalgia is in remission on the Disability form, it was probably bad wording, because there's no real remission for these people. They may have a few good days, but most of the days are bad. They have problems staying up for long periods of time. They have problems concentrating and extreme fatigue keeps them from completing any work that they start.

(*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 12.)

**3.** The policy at issue required that Plaintiff seek Social Security benefits and exhaust the appeals process in the event her benefits were initially denied. Plaintiff urges that this characteristic of the plan should result in Hartford being estopped from now challenging the Social Security Administration's decision. In support of this argument, Plaintiff cites *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir.1998), in which Judge Posner, writing for a panel of the Seventh Circuit, stated that the "penumbra of judicial estoppel" supported imposing ERISA liability on an insurer when (i) the insurance company's attorneys represented the insured before the Social Security Administration, advancing the view that she was disabled, and (ii) the doctors who had examined the insured were unanimous in finding her so disabled. *See* 148 F.3d at 755–56.

The Court declines to adopt Plaintiff's reasoning here. Rather, as the Eighth Circuit stated when faced with a similar argument, "Even if [the Court was] disposed to follow *Ladd*, neither of its conditions is met here: The doctors who examined [Plaintiff] were not unanimous, and the defendant[] did not help [her] make [her] case to the Social Security Administration." *See Conley v. Pitney Bowes*, 176 F.3d 1044, 1050 (8th Cir.1999).

arriving at its initial decision to terminate long-term disability benefits.

### III. Plaintiff Unsuccessfully Appeals Hartford's Decision

Within three weeks of receiving notification that her benefits would be terminated, Plaintiff wrote Hartford and asked that it reconsider its decision. Hartford responded to this request by seeking additional information from Plaintiff's physicians. The physicians' responses to this inquiry varied.

Dr. Kamath maintained, quite emphatically, that Plaintiff was totally disabled within the meaning of the insurance policy. In particular, he wrote Hartford a letter that stated, in pertinent part:

> Ms. Wise has significant problems with concentration and although she tried to do her best with the [functional capacity] evaluation, apparently, she was sick for four to five days after that with very sore muscles, difficulty in walking and worsening of her pain, which made her [have] to take more of her Ultram pain medication that she normally takes for pain. She has reached a stage that even these pain medicines are not helping the pain. She is seeing a Rheumatologist right now for her problem. . . .

> She complains with a lot of back pain, neck pain, soreness in her muscles, extreme fatigue, difficulty in sitting for long periods of time, moving, [and] standing[,] and based on all of this, I still feel that she is totally disabled.

(*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 12.)

Likewise, Robin S. Kurtz, Plaintiff's psychologist, initially responded to Hartford in September 2000 by stating that Plaintiff's ability to work was "compromised greatly" as a result of her condition, and that the nature of her disease left her with little advance warning of episodes during which she would be unable to work. Dr.

Kurtz concluded, "Ms. Wise's prognosis is unknown and there is some doubt that she will successfully return to the work force full time." Two months later, however, Dr. Kurtz (who had not seen Plaintiff in the interim) supplemented her earlier opinion, explaining:

> I am writing in response to your [Hartford's] letter of 10/26/00. . . . It appears that Ms. Wise is being treated successfully for depressive symptoms as my notes describe a moderated mood on her last 2 visits. By definition, a condition of fibromyalgia leaves a patient with episodes of both unstable mood and physical capabilities. As of our last session, Ms. Wise's mood seemed to have been stabilized and balanced with 50mg Serzone BID. It is my opinion that Deborah Wise was not completely disabled on 9/21/00, our last session.

(*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 191.)

After receiving the foregoing information, Hartford requested that its Associate Medical Director, Manoj Moholkar, M.D., review Plaintiff's medical records, as well as consult with Dr. Kamath and Plaintiff's rheumatologist, Dr. Estrada. According to Dr. Moholkar's report, his conversation with Dr. Kamath resulted in the latter again relating that Plaintiff "ha[d] no capacity to perform even a sedentary occupation." (*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 105.) Dr. Estrada, conversely, apparently informed Dr. Moholkar that "Ms. Wise should not have any difficulty in performing sedentary work, which is essentially her job category." (*See id.*) After summarizing these conversations and Plaintiff's medical records, Dr. Moholkar concluded his report by opining:

> Based on the medical records and my conversation with Dr. Estrada, I do not find substantial support for the claim-

ant's inability to perform a sedentary occupation.

Although the claimant was noted to have depression, it is my opinion that this was part of her physical disease of fibromyalgia/chronic fatigue syndrome rather that [sic] a primary mental/nervous disease. In my opinion, Ms. Wise has the functional capacity to perform a sedentary occupation.

(*Id.* at 105–06.) Dr. Moholkar conceded in his report that his determination, *i.e.,* that Plaintiff could engage in a "sedentary" occupation, conflicted with the functional capacity evaluation, which had found Plaintiff capable of sitting for only five hours per day. (*See id.*)

Hartford also had a vocational consultant prepare an "Employability Analysis." In that analysis, the consultant—citing Dr. Kurtz's second letter and the functional capacity evaluation—opined that Plaintiff "has the transferable skills to perform the following occupations: Cashier I, Teller, Accounting Clerk, Invoice-control Clerk, Order Clerk, Clerk (General). These occupations are sedentary and light in physical demands, exceed the required earning potential of $1392.01 per month, and are prevalent within the national economy." (*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 117 (emphasis omitted).)

In light of the foregoing, Hartford reaffirmed its earlier decision to terminate Plaintiff's disability benefits. This lawsuit followed.

### Discussion

Federal Rule of Civil Procedure 56(c) empowers the Court to grant summary judgment to a litigant in the event that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing the absence of a genuine issue as to any material fact. The applicable substantive law identifies which facts are material, and a fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. 477 U.S. at 249–50, 106 S.Ct. 2505. The Court must view the materials submitted in support of the motion in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

When the nonmovant has the burden of proof at trial, the movant may carry its burden at summary judgment by demonstrating the absence of an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the movant meets this burden, the nonmovant then has the burden of showing that summary judgment is not appropriate by setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party cannot rely on the pleadings, but must file a response which includes other evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that non-movant must come forward with "specific facts" showing genuine issue for trial); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997). Mere conclusory allegations

and assertions are insufficient to create a disputed issue of material fact. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990); *Mack v. W.R. Grace Co.,* 578 F.Supp. 626, 630 (N.D.Ga.1983); *see also TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002) ("Conclusional [sic] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").

With these principles as a foundation, the Court turns to evaluate Hartford's Motion for Summary Judgment. For the reasons that follow, the Court concludes that Hartford is not entitled to a favorable judgment at this juncture.

## I. Framework of Analysis

### A. Three Tiers of Scrutiny

A lawsuit seeking benefits denied by the administrator of an ERISA plan may become subject to three different "tiers" of scrutiny. *See, e.g., Shaw v. Conn. Gen. Life. Ins. Co.,* 353 F.3d 1276, 1282 (11th Cir.2003) (describing three distinct standards of review). In circumstances where the plan does not purport to vest the administrator with discretion to determine eligibility for benefits or to construe the terms of the plan, the court is empowered to review the denial decision *de novo. See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Conversely, where the terms of the plan provide the administrator with such discretion, its decision to deny benefits is, as a general matter, afforded substantial deference, subjected only to an "arbitrary and capricious" or "abuse of discretion" standard of review. *See Shaw,* 353 F.3d at 1282; *see also Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1558 n. 1 (1990) (explaining that "abuse of discretion" and "ar-

bitrary and capricious" describe same level of scrutiny).

Nevertheless, where a plan administrator, vested with discretion, is afflicted with a conflict of interest—*e.g.,* in circumstances where the administrator retains control over the decision-making process, but must pay the relevant benefits out of its own funds—this deferential review is tempered, and a third standard of review is employed. *See Brown,* 898 F.2d 1556 at 1566–67. According to the Eleventh Circuit, that standard is one of "heightened" arbitrary and capricious review, and it entitles the administrator's decision to significantly less deference than it would receive absent the conflict. *Id.* Moreover, this "heightened" level of scrutiny applies regardless of whether the dispute in question turns on a question of fact, or on the proper construction to be given the plan. *See Torres v. Pittston Co.,* 346 F.3d 1324, 1329 (11th Cir.2003) ("We reject the Insurers' invitation to distinguish between legal and factual determinations so that an ERISA fiduciary's factual determinations would be entitled to the arbitrary and capricious standard of review even though the fiduciary is under a conflict of interest.").

Here, the parties appear to agree that Hartford, at the time it terminated Plaintiff's benefits (and affirmed that decision upon subsequent review), was both vested with discretion under the plan and suffered from a conflict-of-interest. Thus, this last, "heightened" arbitrary and capricious standard is the measuring stick against which the Court evaluates whether Plaintiff's claim against Hartford is viable under ERISA.

### B. Heightened Arbitrary and Capricious Review

In this Circuit, once the heightened arbitrary and capricious standard is select-

ed as the appropriate "tier" of scrutiny, the court's analysis progresses in essentially three steps.[4] First, engaging in a *de novo* review, the Court determines whether the decision to deny benefits was "wrong." *Williams*, 373 F.3d at 1138.[5] If it is not, then the administrator prevails. *Id.* In the event that the Court finds the decision "wrong," however, it proceeds to the second step to determine whether the insurer's decision was nevertheless "reasonable." *Id.*[6] Should the administrator's decision prove both wrong and not reasonable (*i.e.,* arbitrary and capricious), then the claimant is entitled to prevail. *Id.*

A more difficult situation arises, however, when the administrator's decision to deny benefits is wrong, but nevertheless "reasonable." Were the decision to be subjected only to an arbitrary and capricious standard of review, it would be entitled to deference, and the administrator would not be held liable. *Id.* But under heightened arbitrary and capricious standard, something more is required before the administrator may escape liability. Just what that "something" is, however, remains open to debate.

According to *Brown*, in which the Eleventh Circuit first articulated the contours of the "heightened" arbitrary and capricious inquiry, the Circuit stated:

> [W]e hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

898 F.2d at 1566–67. Nevertheless, *Brown*, as the foregoing passage illustrates, dealt with a dispute between an administrator and a participant that was primarily legal in nature—that is, dealt primarily with the proper interpretation to be given the plan itself. *See id.* Subsequent Eleventh Circuit decisions, such as *Torres*, 346 F.3d at 1329, broadly pronounced that *Brown's* "heightened" arbitrary and capricious standard of review applied equally to challenges to an administrator's factual determinations. Such decisions did not, however, concern themselves with the mechanics of the "heightened" standard in the arena of challenges to an administrator's factual conclusions. A more recent Circuit decision, moreover, expressly called into question whether *Brown's* precise burden-shifting mechanism should apply in such circumstances,

---

4. The Court acknowledges that the actual "steps" in the analysis have been articulated in several different ways within this Circuit. *See, e.g., Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir.2004) (integrating steps to determine proper level of scrutiny with remainder of "test," arriving at six-prong analytical framework). Nevertheless, where, as here, the parties' agree that the administrator both possessed discretion in denying benefits and suffered from a conflict-of-interest, only three steps are needed to resolve the claimant's case.

5. A decision is "wrong" when the court disagrees with it. *See Williams,* 373 F.3d at 1138.

6. A decision is "reasonable" when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *See Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989).

and, in the event it did not apply, what inquiry should be used in its place.

In particular, in *Williams v. BellSouth Telecommunications, Inc.*, the Circuit reflected on previous decisions ostensibly applying the heightened arbitrary and capricious standard in the context of factual challenges to an administrator's decision to deny benefits. *Williams*, 373 F.3d at 1138–39. Although acknowledging this apparent application of the *Brown* "test" in such cases, the Circuit went on emphasize that "we did not say whether *Brown's* 'heightened arbitrary and capricious,' burden-shifting approach should be applied to factual determination cases like this." *Id.* at 1139.[7] With that caveat, however, the Circuit declined to articulate an alternative formulation of the "heightened" arbitrary and capricious standard to be applied in such cases, finding that the case before it did not necessitate proceeding past the inquiry into whether the administrator's decision was *de novo* "wrong." *Id.* Rather, it resolved to "leave the issue for another day." *Id.* This Court now finds itself faced with a case in which it must attempt answer the question left unresolved in *Williams*.

## II. Application

### A. The First Step: "Wrong"

■ The gravamen of Hartford's argument in this case is that its determination that Plaintiff was not disabled was not "wrong," and thus, that it is entitled to judgment as a matter of law. In support of this view, Hartford emphasizes, "The

evidence compiled by Hartford, consisting of reports of a Physical Therapist, a Vocational Consultant, an Associate Medical Director of The Hartford, *and* two of plaintiff's three treating physicians, demonstrates that plaintiff is not totally disabled, because all of these individuals agree that plaintiff is capable of performing light duty work." (Def.'s Statement of Undisputed Material Facts [8–1] ¶ 30 (emphasis in original).) The Court finds Hartford's argument unavailing.

As an initial matter, the Court cannot ascribe to Hartford's characterization of the evidence of record. Among other things, the Court disagrees with Hartford's depiction of the opinion of Dr. Kurtz (included by Hartford as one of the "two of plaintiff's three treating physicians" who rendered an opinion favorable to it) as one supporting the view that Plaintiff can perform "light duty work." To the contrary, in her initial letter to Hartford dated September 2000, Dr. Kurtz stated that Plaintiff's ability to work was "compromised greatly" as a result of her condition, and that the nature of her disease left her with little advance warning of episodes during which she would be unable to work. She concluded, "Ms. Wise's prognosis is unknown and there is some doubt that she will successfully return to the work force full time." Later, in response to a letter from Hartford (the content of which is not disclosed), and without having treated Plaintiff in the interim, Dr. Kurtz supplemented her prognosis by stating:

> *Torres* makes clear, the *Williams* court's stated reluctance to apply *Brown* in cases involving factual determinations cannot be seen as calling into question whether "heightened" arbitrary and capricious review applies in such disputes. Instead, the Circuit's opinion in *Williams* can best be understood as casting doubt on whether *Brown's precise* burden-shifting standard should apply in that context.

7. To appreciate the limited scope of the foregoing "disclaimer," it must be compared with the Circuit's holding in *Torres* a year earlier, where it "reject[ed the defendants'] invitation to distinguish between legal and factual determinations so that an ERISA fiduciary's factual determinations would be entitled to the arbitrary and capricious standard of review even though the fiduciary is under a conflict of interest." *Torres*, 346 F.3d at 1329. As

It appears that Ms. Wise is being treated successfully for depressive symptoms as my notes describe a moderated mood on her last 2 visits. By definition, a condition of fibromyalgia leaves a patient with episodes of both unstable mood and physical capabilities. As of our last session, Ms. Wise's mood seemed to have been stabilized and balanced with 50mg Serzone BID. It is my opinion that Deborah Wise was not completely disabled on 9/21/00, our last session.

(*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 191.) Viewed in the light most favorable to Plaintiff, as it must be on summary judgment, this second letter only supports the view that Plaintiff was having a temporary stable episode during her most recent session with her psychologist, and does not detract significantly from Dr. Kurtz's earlier assessment that the capacity fluctuations characteristic of Plaintiff's disease rendered her ability to work "doubtful" and "compromised greatly." [8]

Moreover, Hartford's argument likewise either ignores or brushes aside additional evidence supporting the conclusion that Plaintiff is disabled within the meaning of the plan. Most notably, it pays short shrift to several opinions of Plaintiff's treating physician, Dr. Kamath, who consistently (and at times emphatically) concluded that Plaintiff is unable to perform the duties involved in even a part-time, sedentary job. It also ignores the opinion of Dr. Fuller, stating that Plaintiff's fibromyalgia, paresthesais, and leg pain—which Dr. Fuller opined would endure for Plaintiff's lifetime—rendered her incapable of engaging in gainful employment. Finally, Hartford does not adequately take into account the determination of the Social Security Administration that Plaintiff is disabled, instead falling back on the unhelpful assertion (for purposes of summary judgment) that such a determination is "not dispositive." *See Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1314 (11th Cir. 1999) (while acknowledging that "approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan[,]" went on to state that "a district court may consider the ... Administration's determination of disability in reviewing a plan administrator's determination of benefits[,]" and reversing district court's entry of summary judgment for insured in light of Administration's contrary disability determination).

The most crucial failing in Hartford's argument, however, is that it ignores the procedural posture of this case. This action comes before the Court on a motion for summary judgment. The question, then, is not simply whether this Court is more likely than not to agree with Hartford's disability determination from a *de novo* perspective, but whether there is a genuine issue of material fact with respect to whether its decision was "wrong." Here, in light of the opinions of Dr. Fuller, Dr. Kamath, and Dr. Kurtz, as well as the determination of the Social Security Administration, all concluding (or suggesting) that Plaintiff is totally disabled within the meaning of the plan, there plainly exists such an issue in this case. *See, e.g., Shaw,* 353 F.3d at 1286–87 (in *de novo* analysis respecting whether insurer's decision was "wrong," held that conflicting opinions of various medical providers precluded sum-

---

**8.** Hartford has directed the Court to no authority supporting the view that an insured's ability to perform light work on a given day renders her "not disabled" within the meaning of a plan, notwithstanding the fact that, according to her examining medical professionals, her health could frequently deteriorate on a given day without forewarning, leaving her incapable of holding down employment for any meaningful period of time.

mary judgment on ERISA claim, holding that district court should have instead proceeded to bench trial). Accordingly, the Court cannot say, for purposes of summary judgment, that Hartford's conclusion that Plaintiff was capable of performing light duty work was not "wrong."

## B. The Second Step: Reasonable

■ Conversely, the Court finds that Hartford has adequately demonstrated the absence of a genuine issue of material fact regarding whether its decision was "reasonable." Evidence in the record, including the opinion of Plaintiff's treating rheumatologist, Dr. Estrada, the reports compiled at Hartford's request by its Associate Medical Director and vocational consultant, as well as the functional capacity evaluation report, tend to show that Plaintiff was capable of performing either "light" or "sedentary" work. Such evidence provided Hartford with a "reasonable basis" to terminate Plaintiff's disability benefits, notwithstanding the contrary evidence produced by Plaintiff. *See Jett,* 890 F.2d at 1139 (11th Cir.1989); *see also Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1452 (11th Cir.1997) (finding decision to terminate benefits "reasonable," and affirming summary judgment in favor of plan, notwithstanding existence of some evidence supporting plaintiff's disability).

## C. The Third Step: Comparative Objective Reliability

### 1. *The Standard*

■ As the foregoing analysis demonstrates, neither Hartford nor Plaintiff is entitled to judgment as a matter of law under the first two prongs of the heightened arbitrary and capricious analysis. That the administrator's decision was both reasonable and (for purposes of summary judgment) "wrong," however, does not necessarily foreclose the entry of summary judgment, even in cases where the dispute

between the parties is one of fact, rather than plan construction. *See Barchus v. Hartford Life & Accident Ins. Co.,* 320 F.Supp.2d 1266, 1290 (M.D.Fla.2004) (granting summary judgment to administrator under heightened arbitrary and capricious review, notwithstanding assumption that the administrator's decision was "wrong" and conclusion that the decision was "reasonable"); *cf. also Fick v. Metro. Life Ins. Co.,* 347 F.Supp.2d 1271, 1286–87 (S.D.Fla.2004) (although concluding insurer was entitled to summary judgment on grounds decision was not "wrong," went on to state that insurer would likewise be entitled to summary judgment were the case to be analyzed under third prong of heightened arbitrary and capricious analysis).

As the discussion *supra* demonstrates, however, the standard against which the record must be measured in deciding whether summary judgment is proper at this stage of the heightened arbitrary and capricious review remains amorphous. The Eleventh Circuit in *Williams,* because it was unnecessary to dispose of the case before it, elected to "leave the issue to another day," and did not speak to whether the precise burden-shifting approach adopted in *Brown* could be applied in cases involving disputed factual determinations. *Williams,* 373 F.3d at 1139. That the Circuit even raised the issue, which had appeared (either explicitly or by implication) settled by its decisions in *Torres, Shaw* and *Levinson v. Reliance Standard Ins. Co.,* 245 F.3d 1321 (11th Cir.2001), suggests to this Court that the *Williams* panel saw fit to modify *Brown's* burden-shifting approach in this context.

The inherent stumbling block in a strict application of the *Brown* "test" to cases such as this appears to be that the denial of benefits with respect to one plan participant always increases the reserves out of

which other participants may receive payments, thus providing a constant altruistic "justification" for the insurer's denial of the claim *vis-a-vis* the beneficiaries of the plan. Nevertheless, where, as here, the administrator suffers from a "strong conflict" in that it must pay the claim out of its own funds, *see Brown*, 898 F.2d at 1562, that "justification" is likewise invariably self-serving, providing the very foundation of the "heightened" level of arbitrary and capricious scrutiny to be applied.

Literal application of the rule announced in *Brown*—i.e., that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries"—consequently becomes hopelessly awkward in this context. In the event the insurer's preservation of funds through denial of a claim is held to constitute a viable "justification" in that it "benefit[s] ... the class of all participants and beneficiaries[,]" then the "heightened" arbitrary and capricious standard becomes nothing more than a "reasonableness" test—or, more aptly put, the same arbitrary and capricious standard the court in *Brown* found inappropriate to apply to conflicted ERISA fiduciaries. Alternatively, if it is held *not* to provide such a justification, then it is difficult to conceive exactly what evidence a plan administrator could proffer to meet its burden under *Brown*—the result being that a wrong but reasonable determination would almost invariably fail to insulate the administrator from liability. Under that view, the parties would effectively be using a standard akin to the *de novo* review that *Brown* likewise found undesirable in the context of evaluating the decision of conflicted plan administrators ostensibly vested with "discretion" to interpret and apply an ERISA plan.

But just as the *Brown* standard may seem awkward in the context of a challenge to the factual determinations reached by a conflicted plan administrator, an alternative standard does not readily present itself. As the Circuit observed in *Williams*, it is difficult to formulate a standard of scrutiny that requires an administrator to demonstrate something more than the "reasonableness" of its factual determination, but less than the correctness of it (*i.e.*, that it is not "wrong"), before it may prevail. *See Williams*, 373 F.3d at 1138 ("We described 'heightened arbitrary and capricious review' *supra* as somewhere between the *de novo* and 'mere' arbitrary and capricious standards. But where is that 'somewhere'?") Decisions by the district courts within this Circuit have likewise reflected frustration in the attempt to craft such a standard. *See, e.g., Barchus*, 320 F.Supp.2d at 1289 n. 130.

Forced to attempt to articulate such a standard here, however, this Court concludes that the *Brown* decision itself alluded to the best intermediate standard against which to measure a conflicted administrator's disputed factual determination. In particular, the Circuit Court in *Brown*, briefly considering an isolated factual challenge to the insurance company's decision, stated: "Even a self-interested fiduciary is entitled to choose an apparently more reliable source of information when sources conflict." *Brown*, 898 F.2d at 1568.

In the view of this Court, a comparative, objective analysis respecting the reliability of the various sources before the administrator at the time it made the disputed decision provides a focal point for the court's review that places upon the conflicted administrator a greater burden than merely showing that its decision was not without *some* reasonable basis, but at the same time, does not demand that the

Court actually agree with the decision before it is given deference. Such a standard, moreover, seems consistent with the results reached by other district courts in this Circuit when engaging in the heightened arbitrary and capricious review *vis-a-vis* factual decisions that were presumed to be wrong but reasonable. *See Barchus*, 320 F.Supp.2d at 1290 (in reaching conclusion that insurer was entitled to summary judgment on third prong of heightened arbitrary and capricious review, the court emphasized that the decision to terminate benefits was "well supported in the administrative record"); *see also Fick*, 347 F.Supp.2d at 1286–87 (S.D.Fla.2004) (concluding that insurer would be entitled to summary judgment regarding (assumed) wrong but reasonable decision, noting, *inter alia*, reliability of sources before administrator).[9]

 Accordingly, the Court concludes that a conflicted plan administrator may carry its burden in a suit challenging a "wrong but reasonable" factual determination if it can demonstrate that the opinions and evidence it relied on denying the plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it. By demonstrating that it chose to follow what it reasonably perceived as equally or more objectively reliable data, the insurer substantially ameliorates any fears that its decision was motivated by self-interest rather than by a good faith effort to exercise its discretion to interpret and apply the plan. Should the administrator meet this burden, the plaintiff can then prevail only if he demonstrates that the decision was arbitrary and capricious by "other measures." *Cf. HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 995 (11th Cir.2001) (under heightened arbitrary and capricious analysis involving plan interpretation, in the event that insurer carries burden under third-prong of *Brown*, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious.").[10]

The Court acknowledges that the result of the objective reliability inquiry and that

---

9. In *Fick*, the court appeared to engage in the reliability analysis primarily in its examination of whether the challenged decision was "wrong" for purposes of summary judgment. In particular, it reasoned:

> The only medical evidence in the administrative record during the relevant time period leading up to the date MetLife ceased payment of benefits, which would have supported a finding that the Plaintiff continued to be disabled, was the Plaintiff's treating chiropractor.... Given the quality of the opinions, i.e. a medical doctor versus a chiropractor, and the potential for bias, i.e. an independent examination versus a treating doctor's evaluation, as well as the greater number of conclusions that the Plaintiff was able to work, the court finds that, upon *de novo* review of this administrative record, it cannot be said that MetLife's decision to terminate was "wrong." ·

347 F.Supp.2d at 1281. The court in *Fick* then addressed the second and third prongs of the heightened arbitrary and capricious review, but did so only to "complete the record" in the event that its initial determination was reversed by the Eleventh Circuit. While, as the reasoning *supra*, Part II.A., makes clear, this Court would not be inclined to find such a disparity in reliability sufficient to grant summary judgment to an administrator on grounds that its decision was not "wrong," *Fick* does illustrate the type of objective reliability evaluation this Court believes may function as a separate step in the heightened arbitrary and capricious analysis. Moreover, this Court agrees with the outcome reached in *Fick* based on this reasoning, notwithstanding its respectful disagreement with respect to *where* in the analysis the reliability evaluation occurred.

10. For a helpful discussion of evidence that may permit a plaintiff to demonstrate the "taint" of self-interest even after the administrator discharges its burden, see *Fick*, 347 F.Supp.2d at 1286.

of whether the decision was "wrong" from the perspective of *de novo* review will perhaps more often than not be the same. That said, there are at least two significant differences between the *de novo* review respecting the correctness of the administrator's decision and this "objective reliability" determination, both of which bear mentioning here.

First, at the summary judgment stage, conflicting opinions by healthcare professionals may preclude the court from finding that no genuine issue exists with respect to whether the administrator's decision was *de novo* "wrong." (*See supra* Part II.A.) Nevertheless, when there can be no genuine disagreement with respect to the comparative reliability of conflicting opinions or tests, the mere presence of *some* disparity would not foreclose the entry of summary judgment for the administrator under this prong of the analysis.[11]

Second, under a *de novo* analysis, there may be limited instances in which it

---

11. In making the foregoing observation, the Court remains fully cognizant that "[i]ssues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." *Miller v. King,* 384 F.3d 1248, 1259 (11th Cir.2004) (*quoting McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1240 n. 7 (11th Cir.2003)). The impermissibility of making such subjective determinations under Rule 56 will often prevent the entry of summary judgment in favor of one party where objective measures and/or the medical diagnoses of healthcare professionals sharply conflict. *Cf., e.g., Shaw,* 353 F.3d at 1286–87.

Nevertheless, the Court can envision at least some, if not many instances in which the *objective* reliability of the measures used, especially when juxtaposed with the number of opinions at issue and the degree of the medical professional's interaction with the patient, may leave no *genuine* issue of material fact regarding whether the evidence relied upon by the administrator was at least as reliable as that counterbalancing its decision. *See, e.g., Barchus,* 320 F.Supp.2d at 1290 (reaching conclusion that insurer was entitled to summary judgment on third prong of heightened arbitrary and capricious review, emphasized that the decision to terminate benefits was "well supported in the administrative record"); *cf. also Fick,* 347 F.Supp.2d at 1286–87 (S.D.Fla.2004) (concluding that insurer would be entitled to summary judgment regarding wrong but reasonable decision, noting, *inter alia,* reliability of sources before administrator) (*dicta*). Indeed, several reported opinions within this Circuit have remarked upon the reliability of various testing measures, professional opinions, and other evidence in evaluating the viability of a plaintiff's ERISA claim at the summary judgment stage. *See, e.g., Williams,* 373 F.3d at 1139 (in evaluating whether district court properly granted defendant's motion for summary judgment on grounds that decision was not "wrong," emphasized plaintiff's examination by an independent medical examiner as well as that medical opinion at issue took into account all relevant medical records and diagnoses); *Fick,* 347 F.Supp.2d at 1280 ("A functional capacity evaluation is the best means of assessing an individual's functional level.") (*citing Lake v. Hartford Life and Accident Ins. Co.,* 320 F.Supp.2d 1240, 1249 (M.D.Fla.2004)); *id.* at 1281 (evaluating number of opinions, contrasting chiropractor conclusions with medical doctor opinions, and noting affiliations of physicians in summary judgment analysis regarding whether administrator's decision was "wrong"); *Barchus,* 320 F.Supp.2d at 1286–88 (evaluating reliability of various sources of evidence in determining whether administrator's denial of disability benefits was "reasonable," emphasizing, *inter alia,* lower reliability of subjective complaints versus objective measures, and medical professional's consideration of other relevant opinions and diagnoses in reaching conclusion); *Earnest v. Metro. Life Ins. Co.,* 291 F.Supp.2d 1327, 1337 (M.D.Fla.2003) (in evaluating whether administrator's decision was "wrong" for purposes of summary judgment, underscored evaluating healthcare professional's lack of qualification to render opinion on given diagnosis and "excessive conjecture" in medical opinion).

is proper for the court to consider factual opinions and evidence bearing on the claimant's entitlement to benefits that were not part of the administrative record at the time the administrator denied coverage. *See Moon v. Am. Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir.1989) ("American Home's contention that a court conducting a de novo review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a de novo review."); *cf. also Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 n. 1 (8th Cir.2001) ("Under the de novo standard of review, a district court has some discretion to allow the parties to supplement the record that was before the plan administrator."); *Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1026–27 (4th Cir. 1993) (holding that, in "exceptional circumstances," court is permitted to consider evidence outside the administrative record in *de novo* review under ERISA).[12] Conversely, when evaluating the objective reliability of conflicting evidence, the factual opinions and evidence considered should, as in the context of assessing the "reasonableness" of the administrator's decision, be limited to those before the administrator at the time it made the challenged decision. *Cf. Jett*, 890 F.2d at 1139 ("When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard ..., the function of the court is to determine whether there was a reasonable basis for the decision, *based upon the facts as known to the administrator at the time the decision was made.*") (emphasis supplied).

### 2. *Application*

■ Applying the foregoing standard to the instant case, and while acknowledging that the question before it is perhaps a close one, the Court concludes that Hartford is not entitled to summary judgment.[13] Rather, viewing the evidence in the light most favorable to Plaintiff, genuine issues of fact remain regarding the comparative objective reliability of the information before Hartford at the time it made the decision to terminate Plaintiff's benefits.

■ Plaintiff has come forward with the opinions of at least two examining medical doctors that she is disabled.[14]

12. Some district courts within this Circuit have suggested that even a *de novo* review, at least when undertaken as the first step in the heightened arbitrary and capricious evaluation, should be made with reference solely to the administrative record. *See, e.g., Freling v. Reliance Standard Life Ins. Co.*, 315 F.Supp.2d 1277, 1286 (S.D.Fla.2004). This Court reads the Eleventh Circuit's decision in *Moon*, as well as the persuasive authorities cited *supra*, as militating in favor of a contrary conclusion, and observes that the justifications for limiting the record in assessing whether the administrator had a "reasonable basis" for its denial do not support the exclusion of extraneous evidence when the court's task is instead to assess the correctness of the challenged determination.

13. Although the Court would not anticipate a contrary outcome if circumstances were otherwise, it observes that here, the parties did not specifically brief issues respecting the reliability of the evidence before Hartford at the time it made its decision.

14. The Court refers here to the opinions of Drs. Fuller and Kamath. For sake of clarity, the Court acknowledges here the rule that "plan administrators are not obliged to accord special deference to the opinions of treating physicians[,]" and that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 & 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). The Court notes Drs. Fuller and Kamath's status as examining physicians only to emphasize that they had actual contact with Plaintiff, rather than a mere opportunity to review her "paper" medical file, which speaks to the reliability of their conclusions

Hartford has put forth no argument or evidence to call into question the reliability of these opinions. Moreover, a third healthcare professional, Dr. Kurtz, provided an assessment of Plaintiff's condition that, viewed in the light most favorable to Plaintiff, could reasonably be understood as advancing the view that fibromyalgia precludes her from pursuing "any occupation" for a meaningful period of time. In addition, Plaintiff has obtained a decision from the Social Security Administration that she is "disabled" within the meaning of the Social Security Act.

To Hartford's credit, it has come. forward with a favorable functional capacity evaluation. Such tests have at times been described by courts in this Circuit as "the best means of assessing an individual's function level." *See Lake*, 320 F.Supp.2d at 1249 (M.D.Fla.2004). Nevertheless, the evidence before the Court suggests that, in this instance, the reliability of the evaluation in assessing Plaintiff's disability status is open to debate. The third-party service provider that performed the evaluation (selected by Hartford) appears to have been a physical therapist. While such a professional is typically well-suited to conducting evaluations of a patient's physical capacity, and extrapolating therefrom what tasks the individual is capable of performing, the inherent nature of Plaintiff's disease (as described by her doctors) is prone to unpredictable and frequent remission and relapse. (*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 12 (opinion of Dr. Kamath emphasizing waxing and waning course of disease, and describing Plaintiff's deteriorating condition immediately follow-

ing evaluation); *id.* at 191 (letter from Dr. Kurtz, stating, "By definition, a condition of fibromyalgia leaves a patient with episodes of both unstable mood and physical capabilities.").) Consequently, in this case, the objective reliability of the favorable evaluation (which assessed Plaintiff's capabilities only on a given day) is not such that it would necessarily entitle Hartford to summary judgment in view of significant, and apparently reliable, countervailing evidence.

In addition, Hartford has procured the opinion of one of Plaintiff's examining doctors, Dr. Estrada, that Plaintiff should "not have any difficulty in performing sedentary work, which is essentially her job category." That opinion, however, is reflected only in the writings of Hartford's Associate Medical Director, Dr. Moholkar, who apparently had telephoned Dr. Estrada about Plaintiff's condition. The record is unclear regarding what, beyond this conclusory assessment, was related to Hartford representatives by Dr. Estrada. Moreover, given the existence of at least two other physicians' opinions contradicting that of Dr. Estrada, the Court cannot say that Hartford is entitled to summary judgment when the reported prognosis of Dr. Estrada is taken into account.

The remaining evidence cited by Hartford likewise does not establish, as a matter of law, that the information it relied upon in making its decision was more objectively reliable than that supporting Plaintiff's claim. The "Employability Analysis" prepared by Hartford's vocational consultant cites only the functional ca-

(especially given the dynamic nature of Plaintiff's condition). *Cf. Godfrey v. BellSouth Telecomms., Inc.*, 89 F.3d 755, 758–59 (11th Cir.1996) (observing potential usefulness of in person exam of fibromyalgia patient in ascertaining disability).

The Court likewise acknowledges that Dr. Fuller's opinion was related on a form relat-

ing to "short-term" disability. Although the context of that opinion is not insignificant, the physician's statement that Plaintiff's conditions would persist for her "lifetime" underscores the continued significance of his assessment for purposes of evaluating Plaintiff's long-term disability.

pacity evaluation and the *second* letter of Dr. Kurtz to Hartford to reach the conclusion that Plaintiff is capable of performing some sedentary occupations. (*See* Def.'s Mot. for Summ. J. [8–1], Ex. 3 at 117.) This seemingly incomplete review of the record (or the failure to expressly consider contrary medical opinions) casts doubt on the reliability of the analysis. *Cf. Williams,* 373 F.3d at 1139 (in evaluating whether district court properly granted defendant's motion for summary judgment on grounds that decision was not "wrong," emphasized that medical opinion at issue took into account all relevant medical records). Likewise, the report compiled by Hartford's in-house Associate Medical Director, while taking care to *enumerate* in bullet-form Plaintiff's pertinent medical history, seems conspicuously selective in its *analysis* of Plaintiff's capabilities—seizing on the solicited opinion of one of Plaintiff's treating physicians to the exclusion of others, and expressly dismissing (with no explanation) certain contrary findings in the functional capacity evaluation.

Given the sharply conflicting evidence before Hartford, the quantity of the opinions and determinations supporting Plaintiff's claim, and apparent omissions and inconsistencies in the materials relied on by Hartford, the Court finds that genuine issues of material fact remain in this case. For that reason, Hartford's Motion for Summary Judgment [8–1] is **DENIED.**

### Conclusion

Defendant Hartford Life and Accident Insurance Company's Motion for Summary Judgment [8–1] is **DENIED.** The parties shall submit a Consolidated Pretrial Order within 30 days of the entry of this Order.