Deborah WISE, Plaintiff,

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

Civil Action No. 1:04–CV–0784–RWS.

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 1, 2005.

John Thomas Dufour, Van Pelt & Dufour, Carrollton, GA, for Plaintiff.

Michael Andrew Coval, Nikole Marie Crow, Carter & Ansley, Atlanta, GA, for Defendant.

## ORDER

STORY, District Judge.

This case came before the Court for a bench trial on November 16, 2005. Following its consideration of the evidence and the arguments of the parties, the Court enters this, its Findings of Fact and Conclusions of Law.

### Procedural History

Plaintiff initiated this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking benefits denied to her by Defendant Hartford Life and Accident Insurance Company ("Hartford") under an employer-sponsored long-term disability plan. Based on the evidence assembled in connection with its evaluation of Plaintiff's claim, Hartford moved for summary judgment, contending that the decision to terminate payment of long-term disability benefits to Plaintiff was both reasonable and correct.

Applying a "heightened" arbitrary and capricious standard of review to Hartford's decision, *see Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1568 (11th Cir.1990), the Court addressed the merits of its motion. *See Wise v. Hartford Life & Accident Ins. Co.,* 360 F.Supp.2d 1310

(N.D.Ga.2005). In doing so, it found that Hartford had a reasonable basis in the administrative record for denying Plaintiff benefits, but that genuine issues of material fact existed regarding whether Hartford's decision was nevertheless "wrong" from the perspective of *de novo* review. *Id.* at 1319–21. Assuming for purposes of Rule 56(c) that the decision was indeed "wrong," the Court concluded that Hartford could prevail only by demonstrating "that the opinions and evidence it relied on denying the Plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it." *Id.* at 1323. It reasoned:

> By demonstrating that it chose to follow what it reasonably perceived as equally or more objectively reliable data, the insurer substantially ameliorates any fears that its decision was motivated by self-interest rather than by a good faith effort to exercise its discretion to interpret and apply the plan. Should the administrator meet this burden, the plaintiff can then prevail only if he demonstrates that the decision was arbitrary and capricious by "other measures."

*Wise,* 360 F.Supp.2d at 1323.

Evaluating the record before it in the light most favorable to Plaintiff, the Court held that a reasonable fact-finder could conclude that Hartford had failed to carry its burden on the issue of comparative reliability. It accordingly denied Hartford summary judgment.

Thereafter, Hartford filed a motion *in limine* seeking to limit the evidence at trial to that which was contained in the administrative record. The Court granted the motion. (*See* June 13, 2005 Order.) The case proceeded to trial on that record on November 16, 2005.

## Findings of Fact

### I. The Policy

Plaintiff is a former employee of Wal-Mart. At the time relevant to this action, Hartford was under a contract with Wal-Mart to provide group long-term disability income insurance to Wal-Mart's eligible employees. The group policy (the "Policy") defined the term "Total Disability" to mean:

(1) during the Elimination Period; and

(2) for the next 12 months, you are prevented by:

  (a) accidental bodily injury;

  (b) sickness;

  (c) Mental Illness;

  (d) substance abuse; or

  (e) pregnancy,

from performing the essential duties of your occupation, and are under the continuous care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment Approved by us.

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.

It went on to provide, under the caption, "Benefit Payment Due to Disability," that:

You will be paid benefits if, while insured under the group policy, you:

(1) become Totally Disabled;

(2) remain Totally Disabled throughout the Elimination Period;

(3) remain Disabled beyond the Elimination Period; and

(4) submit proof of loss satisfactory to The Hartford.

. . .

The Hartford will pay benefits until the first to occur of:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof that you are continuously Disabled;

. . .

Finally, the Policy vested Hartford with the "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."

## II. Plaintiff's Claim and Hartford's Ultimate Denial of Benefits

In June 1999, Plaintiff submitted a claim for benefits under the Policy stating that she became totally disabled due to mitral valve prolapse, fibromyalgia, arthritis, and depression. Hartford approved Plaintiff's claim, and informed her of its decision by letter dated July 28, 1999. It likewise advised Plaintiff that payment of benefits would continue, subject to the terms and limitations of the Policy, while she met the definition of total disability, which would change from "own occupation" to "any occupation" effective July 10, 2000.

In February 2000, Hartford began its investigation concerning whether Plaintiff was totally disabled within the meaning of the "any occupation" provision of the Policy. To that end, Hartford requested and received medical records from the following physicians and mental health professionals: (i) Keith Fuller, D.O., a family practice physician who last treated Plaintiff in June 1999; (ii) Runas Powers, M.D., a rheumatologist to whom Dr. Fuller referred Plaintiff; (iii) Robin Kurtz, Ed.D., a clinical psychologist; (iv) Arvind P. Ka-

math, M.D., an internist with a general medical practice; and (v) Adahli Estrada, M.D., a rheumatologist to whom Dr. Kamath referred Plaintiff. Hartford also required that Plaintiff undergo a functional capacity evaluation.

After reviewing the records submitted by these professionals, which are discussed in greater detail *infra*, Hartford concluded that Plaintiff was not prevented by virtue of a disability from performing the essential duties of any occupation for which she was qualified by education, training, or experience within the meaning of the Policy. Plaintiff, upon being notified of this conclusion, appealed the decision within Hartford, and submitted the opinion of an Administrative Law Judge ("ALJ") at the Social Security Administration awarding her disability benefits.[1] She further indicated that she would provide Hartford with additional information supporting the existence of her disability.

The record does not reflect that the information Plaintiff had indicated she would provide to Hartford was forthcoming. Nevertheless, Hartford, during the process of reconsideration, obtained updated medical records respecting Plaintiff's status, had its Associate Medical Director, Manoj Moholkar, M.D., review such records and speak with Plaintiff's physicians to better understand her condition, and procured an "Employability Analysis" from a vocational consultant evaluating Plaintiff's ability to obtain employment within the national economy. After reviewing this information, Hartford affirmed its earlier decision discontinuing Plaintiff's disability benefits.

---

1. The Policy required that participants seeking disability benefits apply to the Social Security Administration for a disability award, and, if that award is denied, request reconsideration and a hearing before the Administration's Office of Hearings and Appeals. Moreover, the Policy considers Social Security disability payments "other income" under the Policy, which are subtracted from the benefits a disabled participant would otherwise be entitled to receive from Hartford.

## III. The Administrative Record

At the time Hartford reached its decision to deny Plaintiff benefits, it had before it nine sources of information: (i) the opinion of Dr. Fuller, a former treating physician; (ii) the opinion of Dr. Powers, a former treating rheumatologist; (iii) the opinion of Dr. Kurtz, a treating clinical psychologist; (iv) the opinion of Dr. Kamath, a treating physician; (v) Dr. Estrada, a treating rheumatologist; (vi) the functional capacity evaluation, prepared by Plaintiff's physical therapist; (vii) the Employability Analysis, prepared by a Hartford-selected vocational consultant; (viii) the decision of the Social Security Administration; and (ix) the opinion of Hartford's in-house Associate Medical Director, Dr. Moholkar. The data reflect as follows:

### A. Dr. Fuller

On June 1, 1999, Dr. Fuller, an orthopedist managing a family practice, diagnosed Plaintiff as having fibromyalgia, parasthesias, and leg pain, and related his expectation that these conditions would persist for Plaintiff's "lifetime." On a form entitled, "Short Term Disability Claim/Medical Statement," moreover, Dr. Fuller stated that Plaintiff was not "physically and mentally capable of engaging in gainful employment." (*See* CR00066.) A review of Dr. Fuller's progress notes indicates that Plaintiff was experiencing "good days and bad," and shows that as of Plaintiff's last visit with Dr. Fuller in June of 1999, it was his recommendation that she remain out of work for two months. (*See* CR00072 & 00074.)

In a letter dated October 26, 2000, Hartford advised Dr. Fuller that "[it] did not find that Ms. Wise was totally disabled from any occupation for which she was qualified ... by education, training or experience and [it had] denied further benefits on [her] claim." (CL00209–00210.)

Hartford asked that if Dr. Fuller disagreed with its benefits determination, he respond to the letter by providing his contrary opinion and supplying any records supporting that assessment. The record indicates that Dr. Fuller declined to respond to Hartford's request due to the lapse of time since he had last evaluated Plaintiff, and his feeling that, consequently, "he was unable to assess her current functionality." (CL00186.)

### B. Dr. Powers

In April of 1999, Dr. Fuller referred Plaintiff to Dr. Runas Powers, a rheumatologist, for an arthritis assessment and for treatment of fibromyalgia. About mid-June of that year, Dr. Powers diagnosed Plaintiff with "fibromyalgia, associated with chronic fatigue syndrome, with Epstein–Barr virus, as well as HHV–6 virus antibody[,]" and went on to observe that Plaintiff "also has systolic mitral valve prolapse and an arthritis unclassified. Her sedimentation rate is up, which suggests that she probably has some underlying connective tissue disease." (CL00037.) He stated as well that Plaintiff had been "go[ing] downhill" since she was first diagnosed with fibromyalgia in 1997, and was presently "having significant problems trying to sustain normal life functions." (CL00037.) Approximately one month earlier, however, Dr. Powers had "offered to release [Plaintiff] to go back to work," but noted that "she was reluctant to do so." (CL00053.)

By letter dated October 26, 2000, Hartford informed Dr. Powers of its determination that Plaintiff no longer was disabled, and enclosed with the letter a copy of the functional capacity evaluation report so indicating. Although Dr. Powers was invited to submit countervailing evidence if he disagreed with the determination, the record does not reflect that he made a re-

sponse to Hartford's letter. (CL00211–00212.)

### C. Dr. Kurtz

Dr. Kurtz is a clinical psychologist to whom Plaintiff was referred by Dr. Fuller. She initially wrote Hartford in September 2000 (the "First Kurtz Letter"), stating, in relevant part:

This letter is in reference to the request of Ms. Deborah Wise on 9/21/00. I became acquainted with Ms. Wise on 1/19/99. She came at the referral of Keith Fuller, D.O., her medical doctor. She has been seen seven times since the initial intake appointment with the last being 9/21/00.

. . .

It would appear that Ms. Wise's ability to work is compromised greatly in that she has little prior knowledge of her capability to perform day to day activities. This would make maintaining employment difficult. If her cognitive and physical conditions could be stabilized, it would appear likely that Ms. Wise could again be gainfully employed and productive in the work force.

At the present time, there is no standard protocol for care and treatment of patients with fibromyalgia. Ms. Wise's prognosis is unknown and there is some doubt that she will successfully return to the work force full time.

(CL00046.)

The next month, Hartford informed Dr. Kurtz of its determination that Plaintiff was not disabled from performing any occupation under the Policy, and asked her to address certain questions—including whether she felt that Plaintiff was unable to maintain gainful employment—in light of the medical records and functional capacity evaluation report it had enclosed along with its correspondence. (CL00204–00206.) Dr. Kurtz responded by letter dated November 20, 2000 (the "Second Kurtz Letter"), in which she stated:

I am writing in response to your letter of 10/26/00. I have not seen Ms. Deborah Wise since my last correspondence with you. It appears that Ms. Wise is being treated successfully for depressive symptoms as my notes describe a moderated mood in her last 2 visits. By definition, a condition of fibromyalgia leaves a patient with episodes of both unstable mood and physical capabilities. As of our last session, Ms. Wise's mood seemed to have been stabilized and balanced. . . . It is my opinion that Deborah Wise was not completely disabled on 9/21/00, our last session.

(CL00191.)

### D. Dr. Kamath

Apparently due to a change in the Plaintiff's insurance coverage, she stopped seeing Dr. Fuller and Dr. Powers in mid–1999, and began instead regularly seeking the treatment of Dr. Kamath, an internist engaged in the general practice of medicine. In his first visit with Plaintiff, Dr. Kamath noted: "She does have a lot of sinus problems, headaches, dizziness and fibromyalgia symptoms. The patient is being worked up by Dr. Powers for fibromyalgia. They are trying to get disability." (CL00013.)

Plaintiff returned to Dr. Kamath's office on September 24, 1999, complaining of a sinus infection and headaches. Dr. Kamath remarked that Plaintiff was "currently on disability and does not seem to be keen on return[ing] to work in the immediate future." (CL00014.) Dr. Kamath also noted that Plaintiff had "tender points over her musculoskeletal examination, which indicates fibromyalgia. However, that seems to be in a bit of remission at present." (*Id.*)

Then, on March 23, 2000, Dr. Kamath reported to Hartford that Plaintiff's condition was stable and that she was a good candidate for rehabilitation. He nevertheless stated that her prognosis for return to work was "not good [until] symptoms of fibromyalgia improve." (CL00010.) He indicated that Plaintiff could sit for two to three hours, stand for one to two hours, and walk for one to two hours in an eight hour day. (CL00011.)

Approximately four months thereafter, Dr. Kamath noted that Plaintiff "got her disability, now she wants her staging, functional capacity, which the Insurance Company wants to send her to another Doctor." At that time, he noted that Plaintiff's back pain was "still about the same" and that she experienced shortness of breath during instances of exertion and had difficulty walking. (CL00017.)

Then, in October of 2000, Hartford informed Dr. Kamath of its determination that Plaintiff was no longer disabled within the meaning of the Policy. Hartford requested that he review the functional capacity evaluation report, and, if he disagreed with Hartford's determination, that he provide any evidence he believed supported Plaintiff's claim. One month later, Dr. Kamath noted in Plaintiff's medical record that she was "extremely ill at times and she cannot do any gainful employment. I refilled her Disability forms and she has difficulty concentrating, focusing and this is all part of the progressive fibromyalgia, chronic fatigue syndrome that she has." (CL00038.) In a letter dated November 30, 2000, Dr. Kamath stated that Plaintiff had good days and bad days, expressed the opinion that Plaintiff was totally disabled, and related Plaintiff's statement that the functional capacity evaluation ordered by Hartford had left her sick for approximately four days.

On May 23, 2001, Dr. Moholkar, Hartford's Associate Medical Director, conferred with Dr. Kamath concerning Plaintiff's reported disability, and prepared the following written summary of their conversation:

You stated that you initially saw Ms. Wise in 1999, and the last time you saw her was on or about November [29], 2000. She carries the diagnosis of chronic fatigue syndrome and fibromyalgia for the time period you have seen her. You also indicate that [these] are chronic conditions, and currently there is no definitive treatment for the diagnoses, and that she has "good days and bad days." You also stated that chronic pain and extreme fatigue have kept her from performing sedentary work, even though the Functional Capacity Evaluation indicated that she would be able to function in [a] light work category.

(CL00110.) Dr. Moholkar then sent the summary to Dr. Kamath, requesting that he "[p]lease make any corrections or additions that [were] necessary" within ten business days. (*Id.*) The record does not reflect that Dr. Kamath responded to this request.

### E.  Dr. Estrada

Dr. Estrada is the rheumatologist to whom Dr. Kamath referred Plaintiff. During her initial examination of Plaintiff on May 9, 2000, Dr. Estrada noted a decreased range of movement in Plaintiff's neck, but a good range of movement in her back, with no tenderness over the spine. She found, moreover, that Plaintiff had normal strength throughout all of her muscle groups. Further, during that visit, Plaintiff reported no history of shortness of breath, numbness or tingling of the hands or feet, or weakness of the legs or arms. (CL00018–00019.) In the ensuing visits with Plaintiff, Dr. Estrada recorded that her fibromyalgia syndrome had im-

proved with pain medication and exercise. (CL00088–00089.)

On June 20, 2000, Dr. Estrada referred Plaintiff to Jennifer Mott, PT. Mrs. Mott assessed Plaintiff's rehabilitative potential as good, and outlined a 30–day care plan for rehabilitation, which Dr. Estrada approved. (CL00084–00085.) By July 2000, Dr. Estrada, on a Short Term Disability Form similar to that submitted by Dr. Fuller a year earlier, reported that Plaintiff was "physically and mentally capable of engaging in gainful employment." (*Id.* at CL00083.)

On February 21, 2001, after being informed by Plaintiff that Dr. Estrada could provide it with objective evidence supporting her disability, Hartford asked Dr. Estrada to submit such evidence, and requested that she complete a physical capacity evaluation form detailing Plaintiff's condition. The record does not indicate that the requested information was submitted by Dr. Estrada. However, on May 23, 2001, Dr. Estrada conferred with Dr. Moholkar, the latter of whom summarized their [conversation] as follows:

> You indicated that you were consulted in regard to the claimant's fibromyalgia and chronic fatigue syndrome. You indicated that you saw her approximately a year ago. You also indicated that she would be able to do sedentary type of work as per your last examination. You concurred with me that her job description, which is of an Office Manager, is a sedentary type of work and should not pose any difficulty for her.

(CL00109.) Dr. Moholkar sent the written summary to Dr. Estrada, requesting that she "make any corrections or additions that [were] necessary...." (*Id.*) The administrative record reflects that no such additions or corrections were made.

### F. The Functional Capacity Evaluation

Hartford, as part of its disability determination, required that Plaintiff submit to a "functional capacity evaluation." That evaluation was performed in August of 2000 by Mrs. Mott, the same physical therapist from whom Plaintiff had been receiving therapy, and who authored the "Care Plan" approved by Dr. Estrada. (*Compare* CL00197–00201 *with* CL00084–00085.) That evaluation indicated (1) that Plaintiff "would be capable of functioning in a light work category"; (2) that Plaintiff "demonstrated a good aerobic capacity and her physiological response to activities was appropriate"; and (3) that, in an eight hour day at any light work category job, Plaintiff could sit up to five hours, stand up to four hours, and walk up to two hours. (CL00197.)

### G. The Employability Analysis

Hartford additionally commissioned an Employability Analysis, which was prepared by a vocational consultant on April 27, 2001. The Analysis concluded that Plaintiff had transferrable skills to perform several occupations, including "Cashier I, Teller, Accounting Clerk, Invoice-control Clerk, Order Clerk, Clerk (General)," all of which "are sedentary and light in physical demands, exceed the required earning potential ..., and are prevalent within the national economy." (CL00117.)

### H. The Decision of the Social Security Administration

Although Plaintiff was twice denied benefits by the Social Security Administration, her disability claim was ultimately approved by an ALJ on July 23, 2000. In particular, the ALJ determined that Plaintiff's impairments (*e.g.*, fibromyalgia and major depressive disorder) were "severe," and that she was "unable to return to any

past relevant work, and the occupational base is so severely eroded that there are no other jobs existing in significant numbers in the national economy that she can perform." (CL00296.)

Notably, however, the opinions upon which the ALJ relied were one to three years old. Consequently, they did not include (i) the opinion of Dr. Estrada that Plaintiff was capable of engaging in sedentary employment; (ii) the Second Kurtz Letter; or (iii) the subsequently performed functional capacity evaluation and Employability Analysis. (*Id.*)

## I. Dr. Moholkar's Review

Finally, at the time Hartford made its ultimate decision to deny Plaintiff disability benefits, it had before it the favorable opinion of its Associate Medical Director, Dr. Moholkar. Dr. Moholkar, an internist, reviewed the medical records submitted to Hartford, and spoke to physicians from whom Plaintiff was contemporaneously receiving treatment—Dr. Kamath and Dr. Estrada. (CL00101–00105.) At the conclusion of his review, Dr. Moholkar, although acknowledging that Plaintiff's symptoms were consistent with fibromyalgia and chronic fatigue syndrome, found no substantial evidence in the records to support Dr. Kamath's opinion that the severity of her condition was such that Plaintiff was incapable of performing even sedentary work, and concluded instead that the medical evidence supported Dr. Estrada's determination that Plaintiff was capable of performing such work. (*Id.* at CL00105–00106.)

## Conclusions of Law

Plaintiff's claims arise under ERISA § 502, 29 U.S.C. § 1132(a)(1)(B), which provides for a private right of action on the part of an ERISA plan beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." A lawsuit seeking benefits under ERISA § 502 may become subject to three different "tiers" of scrutiny. *See, e.g., Shaw v. Conn. Gen. Life. Ins. Co.,* 353 F.3d 1276, 1282 (11th Cir. 2003) (describing three distinct standards of review). In circumstances where the plan does not purport to vest the administrator with discretion to determine eligibility for benefits or to construe the terms of the plan, the court is empowered to review the denial decision *de novo. See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Conversely, where the terms of the plan provide the administrator with such discretion, its decision to deny benefits is, as a general matter, afforded substantial deference, subjected only to an "arbitrary and capricious" or "abuse of discretion" standard of review. *See Shaw,* 353 F.3d at 1282; *see also Brown,* 898 F.2d at 1558 n. 1 (explaining that "abuse of discretion" and "arbitrary and capricious" describe same level of scrutiny).

Nevertheless, where a plan administrator, vested with discretion, is afflicted with a conflict of interest—*e.g.,* in circumstances where the administrator retains control over the decision-making process, but must pay the relevant benefits out of its own funds—this deferential review is tempered, and a third standard of review is employed. *See Brown,* 898 F.2d at 1566–67. According to the Eleventh Circuit, that standard is one of "heightened" arbitrary and capricious review, and it entitles the administrator's decision to significantly less deference than it would receive absent the conflict. *Id.* Moreover, this "heightened" level of scrutiny applies regardless of whether the dispute in question turns on a question of fact, or on the proper legal construction to be given the

plan. *See Torres v. Pittston Co.*, 346 F.3d 1324, 1329 (11th Cir.2003) ("We reject the Insurers' invitation to distinguish between legal and factual determinations so that an ERISA fiduciary's factual determinations would be entitled to the arbitrary and capricious standard of review even though the fiduciary is under a conflict of interest.").

Here, the parties agree that Hartford, at the time it terminated Plaintiff's benefits (and affirmed that decision upon subsequent review), was both vested with discretion under the plan and suffered from a conflict-of-interest. Thus, this last, "heightened" arbitrary and capricious standard is the measuring stick against which the Court must evaluate Plaintiff's § 502 claim. The Court's analysis consequently proceeds in three steps:

First, engaging in a *de novo* review, the Court must determine whether the decision to deny benefits was "wrong." *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir.2004). A decision is "wrong" when the Court disagrees with it. *See Williams*, 373 F.3d at 1138. If the Plaintiff is unable to carry her burden of demonstrating the decision is "wrong," then the administrator prevails. *Id.; see also HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 994–95 (11th Cir.2001) (burden shifts to self-interested plan administrator only after underlying decision has been proven wrong but reasonable). In the event that the Court finds the decision "wrong," however, it must proceed to the second step in the inquiry.

Under this second step, the Court must determine whether the decision, albeit wrong, was nevertheless "reasonable." *Id.* A decision is "reasonable" when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *See Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989). Should the administrator's decision prove both wrong and not reasonable (*i.e.*, arbitrary and capricious), then the claimant is entitled to prevail. *Id.* In circumstances where the decision is shown to be both wrong and reasonable, however, the Court's inquiry continues.

At this third stage of the analysis, the burden shifts to the administrator to show its decision was not infected by self-interest. *Brown*, 898 F.2d at 1566–67. This Court held in its March 9, 2005 Order that an administrator may meet this burden notwithstanding the incorrectness (*i.e.*, "wrongness") of its decision by showing "that the opinions and evidence it relied on denying the Plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it." *Wise*, 360 F.Supp.2d at 1323. If it carries this burden, "the plaintiff can then prevail only if he demonstrates that the decision was arbitrary and capricious by 'other measures.'" *Id.*

The Court has already determined that, in this case, Hartford had a reasonable basis upon which to deny Plaintiff benefits. *See Wise*, 360 F.Supp.2d at 1321. Thus, the questions presently before it are whether the decision to deny benefits was wrong, and if so, whether Hartford has carried its burden of demonstrating that its decision was not "tainted" by self-interest.

## I. Was Hartford's Decision to Deny Plaintiff Benefits Wrong?

■ At the November 16, 2005 hearing, both parties to this lawsuit did a commendable job exploring the disparate evidence before Hartford at the time it made its disability determination, and identifying the virtues and shortcomings associated

with each aspect of the record presented to Hartford during the administrative process. After considering all the evidence contained in the administrative record, and acknowledging that this presents an exceedingly close case, the Court concludes that Plaintiff has not carried her burden of showing that Hartford's decision was "wrong."

Under the terms of the Policy, Plaintiff is entitled to long-term disability benefits only if she is prevented by a physical or psychological condition from performing the "essential duties of *any* occupation for which [she is] qualified by education, training or experience." That benchmark for entitlement to benefits is a high one. And evidence in the record, as it relates to the satisfaction of that standard, is conflicting and close. While it unquestionably demonstrates that Plaintiff is afflicted with a host of symptoms, consistent with a diagnosis of fibromyalgia, that make it more difficult for her to function in the workplace, the Court does not find that she has carried her burden of demonstrating that the conditions under which she labors "prevent" her from engaging in qualifying work as that term is used in the Policy. *Cf. Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working ..., but most do not and the question is whether [plaintiff] is one of the minority.") (Posner, J.).

In reaching this conclusion, the Court finds two aspects of the administrative record especially persuasive. First is the opinion of Dr. Estrada, the rheumatologist to whom Dr. Kamath referred Plaintiff. Dr. Estrada is the most recent specialist in the field of fibromyalgia—the primary culprit identified by Plaintiff for her disability—to observe and treat Plaintiff. *See Benecke v. Barnhart,* 379 F.3d 587, 594 n. 4 (9th Cir.2004) ("Rheumatology is the relevant specialty for fibromyalgia.... Specialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community."); *Kosiba v. Merck & Co.,* 384 F.3d 58, 68 (3rd Cir.2004) ("fibromyalgia is most commonly treated by a rheumatologist"); *Sarchet,* 78 F.3d at 307 ("Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."). Her familiarity with the disease, which, while serious, is not typically "totally" disabling, *see Sarchet,* 78 F.3d at 307, puts her in a singularly able position to evaluate the severity of Plaintiff's disease.[2] Accordingly, the Court places considerable weight on her observation that Plaintiff's fibromyalgia symptoms had begun to improve with pain medication and exercise, and that she was "physically and mentally capable of engaging in gainful employment."

Second, the Court finds persuasive the results of Plaintiff's functional capacity evaluation. As it previously observed, functional capacity evaluations have "been described by courts in this Circuit as 'the best means of assessing an individual's function level.'" *See Wise,* 360 F.Supp.2d at 1326 (*quoting Lake v. Hartford Life & Accident Ins. Co.,* 320 F.Supp.2d 1240, 1246 (M.D.Fla.2004)). At the November hearing, moreover, Hartford emphasized that this evaluation was performed, albeit at its direction, by Mrs. Motts—the same physical therapist that Plaintiff had already been seeing at the direction of her

---

**2.** The Court acknowledges that Dr. Powers is also a rheumatologist, but Dr. Estrada evaluated Plaintiff more recently and at times more germane to the instant inquiry. Moreover, while Dr. Powers' observations were at times favorable to Plaintiff, he neglected to supply additional records that would support his assessment notwithstanding Hartford's request that he do so.

treating physician. While, admittedly, a one-day evaluation is not without its limitations in the context of a disorder that is known to "wax and wane" in its symptomatic severity, the Court's confidence in Mrs. Motts' conclusion that Plaintiff is not totally disabled is materially bolstered by her previous interactions with Plaintiff during a broader period of treatment.

In light of these highly probative records, both indicating that Plaintiff was not totally disabled within the meaning of the Policy, as well as the Court's reservations respecting other aspects of the administrative record more favorable to Plaintiff (discussed *infra*), the Court finds that Plaintiff has not met her burden of showing that Hartford's decision denying her benefits was incorrect. That is, the Court finds that Plaintiff has not shown, by a preponderance of the evidence, that she was prevented from performing the "essential duties of *any* occupation for which [she is] qualified by education, training or experience."

This finding, without more, would be sufficient to enter a judgment in favor of Hartford. *See Williams*, 373 F.3d at 1138. Nevertheless, given the closeness of the issue, the Court will proceed to the third step in the analysis—whether Hartford has shown that the decision to deny benefits was not infected by improper self-interest.

## II. Has Hartford Carried its Burden of Demonstrating that its Decision was Not Tainted by Self–Interest?

As this Court explained in its March 9, 2005 opinion, "[b]y demonstrating that it chose to follow what it reasonably perceived as equally or more objectively reliable data [in denying a claimant benefits, an ERISA administrator] substantially ameliorates any fears that its decision was motivated by self-interest rather than by a good faith effort to exercise its discretion to interpret and apply the plan." *Wise*, 360 F.Supp.2d at 1323. Accordingly, it held that a conflicted ERISA administrator could prevail in an action challenging its rejection of a claimant's request for benefits by showing "that the opinions and evidence it relied on denying the Plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it." *Id.* at 1323. After reviewing the administrative record, the Court concludes that Hartford has made the requisite showing. Before discussing the evidence at issue in this case, however, the Court takes the opportunity to clarify two aspects of its earlier holding with respect to which there seemed to be some confusion at the November 16 hearing.

Initially, the Court is prompted to clarify the "quantitative" element of the comparative reliability inquiry. By insisting on a quantitative assessment of the evidence, the Court was not suggesting that the issue of an administrator's self-interest could be resolved by a "tally" of the disparate diagnoses of medical professionals. Rather, it was simply indicating that a material imbalance in the number of opinions either supporting or undermining a finding of disability should not be ignored in evaluating an administrator's self-interest. Stated differently, it was acknowledging that "[a]n improper motive sufficient to set aside a fiduciary's decision may be inferred from the fiduciary's failure to investigate or to interpret honestly evidence that greatly preponderates in one direction." *Brown*, 898 F.2d at 1566 n. 11.

The second aspect of the articulated standard the Court takes the opportunity to clarify here is the "objective" component—*i.e.*, the requirement that the evidence supporting the administrator's deci-

sion be "at least as objectively reliable as the countervailing opinions and evidence then before it." *Id.* at 1323. At times during the November hearing, counsel appeared to interpret this facet of the test as requiring that only "objective" measurements of a claimant's condition be considered—that is, that subjective reports from a claimant should be excluded from the Court's comparative reliability analysis. There is a meaningful distinction, however, between an objective *comparison* of the administrative record and objective *tests* that rely solely upon measurable physiological factors rather than upon the subjective complaints of the relevant patient. The Court's March 19, 2005 opinion only insisted upon the former—that is, an unbiased, critical assessment of each opinions' diagnostic and clinical persuasiveness. To be sure, a given test's reliance on purely subjective patient complaints may impact that measure's reliability. But many disorders, fibromyalgia being prominent among them, tend not to manifest themselves in "objectively" verifiable ways. *See, e.g., Sarchet,* 78 F.3d at 306–07 (describing fibromyalgia, stated: "Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."). A requirement that the court undertake a disinterested (or "objective") comparison of professional opinions and evidence respecting a claimant's condition should not be read as excluding disabilities of that sort from coverage.

With those clarifications, the Court turns to evaluate the evidence germane to the instant dispute. After carefully reviewing the record, it concludes that the opinions relied on by Hartford in denying Plaintiff's claim possessed superior reliability to those indicating that Plaintiff was totally disabled within the meaning of the Policy.

As an initial matter, for the reasons stated above, the Court finds the opinions of Dr. Estrada and, through the functional capacity evaluation, Mrs. Motts, highly reliable. Both had the opportunity to directly interact with and observe Plaintiff. Dr. Estrada's opinion, moreover, in light of her specialization in the field of rheumatology, is entitled to unique weight. And functional capacity evaluations have been praised by other courts in this Circuit as singularly effective tools in ascertaining a claimant's functional capability. *Lake,* 320 F.Supp.2d at 1246.

Likewise, viewed *in toto,* the Court finds the opinion of Dr. Kurtz to support Hartford's determination, and finds that Dr. Kurtz's opinion carries with it certain indicia of reliability.

To be sure, Dr. Kurtz, in her first letter, appeared to indicate that Plaintiff's condition was not conducive to full-time employment. She described, somewhat opaquely, Plaintiff's ability to work as "compromised greatly," and expressed "some doubt" as to whether Plaintiff could return to work. (CL00046.) Further, she opined that employment for Plaintiff would prove "difficult." (*Id.*)

At the same time, however, Dr. Kurtz stated that "[i]f [Plaintiff's] cognitive and physical conditions could be stabilized, it would appear likely that [she] could again be gainfully employed and productive in the work force." (*Id.*) Then, approximately two months later, Dr. Kurtz responded to a letter from Hartford by stating, "[Plaintiff's] mood seemed to have been stabilized and balanced" and that it was her opinion that Plaintiff "was not completely disabled on ... our last session." (CL00191.)

Admittedly, Dr. Kurtz had not treated or examined Plaintiff in the two months between when she authored the two letters, and thus, the Court would be disin-

clined to afford weight to any assessments made in the second letter that were inconsistent with those related in the first. A critical reading of the two opinions, however (and one undertaken without the presumptions that accompany the summary judgment analysis), show that Dr. Kurtz's letters are far more consonant than they might first appear. Read together, they simply illustrate that Dr. Kurtz, through her sustained interactions with Plaintiff, found that she faced certain, not insubstantial obstacles in maintaining full-time employment (i.e., obstacles that made working "difficult" and "compromised" her ability to work "greatly"), but that she was not "completely disabled" at the time of her most recent visit, and that stabilization of her condition would enable her to engage in gainful employment and was attainable (if not already attained). Hartford was free to rely on such an assessment, and to it afford it some weight, in its resolution of Plaintiff's claim.

Weighing against such evidence are the opinions, or at least certain portions of the opinions, of Dr. Fuller, Dr. Powers, and Dr. Kamath, as well as the determination of the Social Security Administration.[3] Upon close examination, the Court finds them to lack the same level of reliability found in the opinions and evidence that support Hartford's ultimate decision.

First, Dr. Fuller's opinions were not altogether advantageous to Plaintiff's case.

While he had indicated that the *conditions* from which she suffered might endure for Plaintiff's "lifetime," he had been reserved in his assessment that Plaintiff was incapable of working, and indeed, on her last visit, gave her the relatively tempered instruction to remain out of work for only two months.

In any event, Dr. Fuller's opinion predated much of the treatment Plaintiff received for her condition from Dr. Kamath, Dr. Kurtz, Dr. Estrada, and Mrs. Motts. The record indicates that it was that lapse of time that prompted Dr. Fuller himself to decline to opine further as to Plaintiff's disability when contacted by Hartford (*See* CL00186.) And, Dr. Fuller was not a rheumatologist who specialized in disorders such as fibromyalgia, but was instead engaged in a family practice and referred Plaintiff to Dr. Powers for fibromyalgia treatment.

Dr. Powers opinion suffers from many of the same shortcomings. While he is a rheumatologist, Dr. Powers' disability determination preceded, by a considerable period of time, much of Plaintiff's more recent therapeutic and rehabilitative treatments. He was also not entirely consistent in his assessment of Plaintiff's condition, at one time offering to release her back to work. (CL00053.) And, perhaps most importantly, when asked by Hartford to provide support for his ultimate disabili-

---

3. On the side of the equation favoring Hartford, the Court does not place substantial or determinative weight on either the opinion of Dr. Moholkar or the Employability Analysis. First, Dr. Moholkar's evaluation of Plaintiff's condition comprised primarily the synthesis and review of Plaintiff's existing medical records. While Dr. Moholkar brought considerable training and expertise to the task, to give any appreciable weight to his views would effectively result in the artificial inflation of the value placed on those medical opinions which he found most persuasive.

As it relates to the Employability Analysis, performed by vocational consultant, that test concentrated more heavily on the prevalence *vel non* of compatible jobs within the national workforce than on Plaintiff's medical condition. Because the focus of this litigation has centered around the impact Plaintiff's condition had on her ability to perform light or sedentary work, without regard to the availability of such jobs in the broader economy, the Employability Analysis does little to inform the Court's inquiry here.

ty determination, Dr. Powers neglected to do so. Consequently, his opinion seems substantially less reliable than that of Plaintiff's more recently consulted rheumatologist, Dr. Estrada.

That brings the Court to the opinion of Plaintiff's general treating physician, Dr. Kamath. As the Court observed in its March 9, 2005 Order, Dr. Kamath has enjoyed substantial interaction with Plaintiff, and, on occasion, has been singularly insistent that Plaintiff suffers from a disability. That said, while his letters to Hartford reflect a laudable degree of concern for his patient, the Court does not find that Dr. Kamath's assessment was so manifestly reliable that Hartford's decision to disagree with it illustrates the Company's self-interest in denying Plaintiff disability benefits.

First, Dr. Kamath, like Drs. Fuller and Powers, was not unwavering in his determination that Plaintiff was disabled. He at times described her condition as "in remission," (CL0014), and indicated that her condition could "improve." (CL00010.) Second, he is not a specialist in the field of rheumatology, but instead referred Plaintiff to a specialist, Dr. Estrada, for treatment of this purportedly disabling condition. Finally, his statement that Plaintiff had "apparently" been unwell for up to four days following the functional capacity

evaluation does not seem based on any examination he conducted, but rather on the self-reported discomfort of his patient.

Lastly, consideration of the Social Security Administration's decision does little to tip the balance of the "self-interest" inquiry in Plaintiff's favor. Initially, the standards that govern the Social Security disability inquiry are not identical to those which govern a claimant's entitlement to benefits under the Policy. Cf., e.g., Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (recognizing "critical differences between the Social Security disability program and ERISA benefit plans"). In addition, the evidence relied on by the ALJ was somewhat outdated—it did not include, for example, the opinions of Dr. Estrada, the second, clarifying letter of Dr. Kurtz, or the subsequently performed functional capacity evaluation.

In sum, the Court finds that Hartford has succeed in demonstrating that the evidence and opinions it relied upon in denying Plaintiff's claim for disability benefits were at least as objectively reliable as the countervailing opinions and evidence then before it. Moreover, Plaintiff's efforts to highlight self-interest in the administrative process by identifying select anomalies in the record do not undercut Hartford's showing to the contrary.[4] For these rea-

---

4. Plaintiff identified several such alleged anomalies at the November 16 hearing, two of which bear mentioning here. First, she points to the seemingly selective citation of medical opinions in Dr. Moholkar's analysis. After reviewing the record, however, the Court finds that Dr. Moholkar's election to concentrate primarily on the reports of Dr. Estrada and the functional capacity evaluation, and, perhaps to a lesser extent, Dr. Kurtz, merely evinces a justifiable decision to place greatest weight on the opinions reflecting the highest level of reliability.

Second, Plaintiff points to an invoice sent to Hartford respecting the functional capacity

evaluation. One line on that invoice states, "NAME FCE Bonus Earned $250.00," and contains a handwritten notation, apparently from an employee at Hartford, stating "pay this." Although the line does give the Court some pause, Plaintiff, by her own admission, has not adduced any evidence concerning the basis for the bonus. The Court, based on nothing more than Plaintiff's articulated suspicion, is unwilling to assume the bonus reflects a result-oriented payment. It is remarkably implausible that any sophisticated plan administrator would engage in a practice so certain to undermine the legitimacy of any claim denial.

sons, the Court concludes that Hartford has carried its burden of showing that its decision to deny Plaintiff benefits was not infected by self-interest. In light of this conclusion and the Court's earlier holding that Hartford's determination was not incorrect, Plaintiff's requests for a declaration of entitlement to benefits, an award of such benefits, and an award of attorney's fees are hereby **DENIED.** There being nothing further for this Court to resolve, the Clerk is **DIRECTED** to enter judgment in favor of Defendant Hartford Life and Accident Insurance Company.

**SO ORDERED.**

Simply stated, after considering Plaintiff's argument, the Court is unconvinced that Hartford's decision was the product of a biased review.